Stephenson, J.
 

 These cases resolve themselves into two propositions of law: First, do Sections 644 and 5438, General Code, or either of them, contravene the Fourteenth Amendment to the Constitution of the United States? Second, if these sections of the Code are constitutional, did the Superintendent of Insurance in refusing to renew relators’ licenses transcend the authority conferred upon him by such section of the Code?
 

 
 *354
 
 The first section of the Fourteenth Amendment to the Federal Constitution reads as follows:
 

 “All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without du'e process of law; nor deny to any person within its jurisdiction the equal protection of the laws.”
 

 This constitutional provision is usually referred to in brief as the “due process and equal protection clause. ’ ’
 

 The right of the state to regulate all kinds of insurance is fundamental. We adhere to the first two paragraphs of the syllabus in the case of
 
 Verducci
 
 v.
 
 Casualty Co. of America,
 
 96 Ohio St., 260, 117 N. E., 235, as follows:
 

 “The business of insurance is one of public interest, affecting all classes of people and property, and is therefore properly the subject of legislative regulation and control.
 

 “Domestic and foreign corporations engaged in the insurance business in Ohio must conform their business and contracts to the provisions of the statutes of Ohio regulating and controlling the same.”
 

 Let it not be overlooked that a casualty company was being dealt with in the case just cited.
 

 The Superintendent of Insurance is given broad statutory powers. The nature of the business that he is authorized to supervise requires it, and in addition he is clothed with broad implied power in order that he may carry into effect the powers expressly delegated. The statutes involved in this case are remedial and should receive a liberal construction to the end
 
 *355
 
 that they may subserve the purpose of their enactment.
 

 Up to this time this court has not announced it as the law that the Superintendent of Insurance is vested with discretionary power, yet in the dicta in the cases of
 
 State, ex rel. European Accident Ins. Co.,
 
 v.
 
 Tomlinson, Supt. of Insurance,
 
 101 Ohio St., 459, 129 N. E., 684, and
 
 State, ex rel. National Mutual Ins. Co.,
 
 v.
 
 Conn, Supt. of Insurance,
 
 115 Ohio St., 607, 155 N. E., 138, 50 A. L. It., 473, his right to exercise such discretionary power is implied.
 

 Chief Justice Marshall, in the
 
 Conn case,
 
 said:
 

 “Insurance companies may not operate in the state of Ohio without a license, and it necessarily follows that the superintendent of insurance is invested with a measure of discretion in granting or withholding such license.
 

 “This proposition is not one of first impression.”
 

 He cites the
 
 Tomlinson case
 
 in which Jones, J., of this court, said:
 

 “The law gives him [the Superintendent of Insurance] continuing powers of supervision and requires him to see that the insurance laws are enforced. And while no specific power of revocation has been lodged in him, we are constrained to the view that this clause of the section gave him full authority to revoke the license *
 
 *
 
 *, in order to secure compliance with the insurance laws.”
 

 The stipulation of facts and the two depositions cover 115 pages of the record. The stipulation is elaborate in the extreme, and as contended by counsel contains much that can in no wise assist the court in determining the law of these eases. It is stipulated that the Allstate Insurance Company and the Allstate Fire Insurance Company are Illinois corporations, with their principal offices in Chicago. The Allstate Insurance Company was incorporated March 26, 1931,
 
 *356
 
 and on December 31, 1934, had a capital of $350,000 and a surplus of $666,643.67. The Allstate Fire Insurance Company was incorporated December 30, 1931, and on December 31,1934, had a capital of $200,-000 and surplus of $150,634.56.
 

 The Allstate Insurance Company is authorized by its charter to make contracts of insurance insuring against any hazard resulting from the ownership, maintenance or use of any automobile. The Allstate Fire Insurance Company by its charter is authorized to do a general fire insurance business, but has at all times confined its business to automobile coverage.
 

 All the outstanding capital stock of the Allstate Insurance Company has at all times been owned by Sears, Roebuck & Company, a corporation. The capital stock of the Allstate Fire Insurance Company has at all times been owned by the Allstate Insurance Company.
 

 A list of the different states in which these companies have been licensed to transact business is stipulated, likewise a recital of experiences had by the companies in Kentucky and West Virginia. This recital is neither helpful nor hurtful.
 

 On May 2, 1932, the Superintendent of Insurance of the state of Ohio issued licenses to each of these companies, authorizing them to transact business in Ohio, and licenses to the companies were subsequently issued as of March 1,1933, and March 1,1934.
 

 The Allstate Insurance Company has approximately fifteen hundred policy holders in this state, and the Allstate Fire Insurance Company has approximately one thousand policy holders in the state. The Allstate Insurance Company has approximately $100,000 invested in mortgage loans in the state.
 

 At the time of filing these actions and for some time prior thereto these companies maintained an office in the Guardian Building at Cleveland, Ohio, and their
 
 *357
 
 agents, duly licensed by the insurance department of the state of Ohio, were in charge of such office until March 1, 1935.
 

 When the companies were admitted to this state, they appointed one Irving E. Nack, an employee of Sears, Roebuck & Company, as their Ohio agent, and an agent’s license was applied for.
 

 The insurance department of Ohio was then advised that Nack was not in the insurance business and his only functions as agent would be to countersign and deliver policies upon Ohio property, and to record premiums; that all policies were to be prepared by the companies following inquiries received at the home offices through the mail direct from persons desiring insurance as a result of the companies’ advertising, and with all this knowledge a license was issued to Nack.
 

 On May 26, 1932, the companies applied for an agent’s license for one A. W. Gottschalk, an employee of Sears, Roebuck
 
 &
 
 Company, and he was duly licensed as an agent for the state of Ohio on July 13, 1932, after the companies had been advised by letter from the insurance department of Ohio, bearing date of June 11, 1932, that it did not approve of the practice of licensing as insurance agents the employees of mercantile establishments, and in such letter the companies were advised that such practice would not be continued extensively.
 

 On May 11, 1934, the Ohio Association of Insurance Agents, Inc., filed a complaint with the Superintendent of Insurance of the state of Ohio in which complaint it was charged that Gottschalk and Nack were employees of Sears, Roebuck & Company; were not engaged in the insurance business; were not “bona fide” agents within the meaning of Section 644-1, General Code, and that the practice of Gottschalk and Nack of signing policies in blank or having some one at the
 
 *358
 
 home office of relators countersign such policies, using their names, was in violation of Section 5438, General Code.
 

 Charles T. "Warner, the then superintendent of insurance, acquainted the relator companies with the charges. Prior thereto relators had informed the insurance department of Ohio that they intended to appoint M. A. McGrath, of Cleveland, Ohio, and J. S. Atkins, of Toledo, Ohio, as their agents, and on June 21, 1934, application was made for licenses for Mc-Grath and Atkins, who were experienced insurance men.
 

 The filing of the complaint against relators delayed the issuance of 1934 licenses, but relators continued to transact business in Ohio, by sufferance.
 

 On October 2, 1934, a hearing of the complaint was had by Charles T. Warner, superintendent of insurance, and on January 7, 1935, a finding was made by him in which he recited that ‘
 
 ‘
 
 said companies now propose to request licenses for men who are to be bona fide insurance agents, and to increase their agency forces as business increases.”
 

 As a conclusion to his finding, the Superintendent of Insurance stated:
 

 “Under all the circumstances, and from what has been done and what is proposed to be done, we find and determine that a license should be issued to said companies, and agents licenses also be issued to Mr. McGrath and Mr. Atkins, as agents for said companies as per requisition therefor.”
 

 In accordance with such finding, the licenses were issued both to the companies and to McGrath and Atkins as agents, for the current license year ending February 28, 1935.
 

 Thereafter relators applied for and received agents licenses for Miles J. Eyan and Sarah C. Sampliner, both of Cleveland, Ohio, and these were the only
 
 *359
 
 licenses applied for by relators. Atkins operates only in Toledo, Ohio, and the other three operate only in Cleveland, Ohio.
 

 On January 28, 1935, relators filed with the Superintendent of Insurance, as required by law, their financial statements, disclosing that relators were solvent and able to meet all their obligations.
 

 On January 15, 1935, Robert L. Bowen became Superintendent of Insurance of the state of Ohio, and on January 21, 1935, the Ohio Association of Insurance Agents, Inc., filed a renewal complaint and objection to the issuance of renewal licenses to relators and their agents.
 

 The renewed complaint was a substantial replica of the original. In it the new Superintendent of Insurance was advised as follows:
 

 “This protest amounts substantially to a request for a review by you of your predecessor’s decision * * #. We are not content with the former ruling and if you consider the matter closed, are, with the greatest respect for the department, preparing for a review in the courts.”
 

 Relators were not advised as to the filing of the renewal complaint until June 21, 1935, when the then Superintendent of Insurance made a finding that relators were transacting business in Ohio in violation of Sections 644 and 5438, General Code; that relators had not kept their promise made with the former Superintendent of Insurance to create an agency organization, and that the advertising used by it was misleading, and for these reasons relators’ renewal licenses were refused as “it would best promote the public interest” so to do.
 

 It is insisted by relators that the Superintendent of Insurance had no right or authority to make this order, and the twentieth paragraph of the stipulation states the facts upon which they rely.
 

 
 *360
 
 Paragraph. 19 of the stipulations states in full the order of the Superintendent of Insurance, refusing renewal licenses; and paragraph 18 sets out the renewed complaint of the Association of Insurance Agents, Inc. Paragraph 20 of the stipulations is in the words and figures following, namely:
 

 “Said Robert L. Bowen, superintendent of insurance, prior to the issuance and promulgation of the order mentioned in paragraph 19 hereof, did not hold or conduct any hearings in connection with the subject matter of said order or in connection with said renewed complaint mentioned in paragraph 18 hereof, nor was any testimony received by him in connection therewith, nor were relators afforded any opportunity to appear before said Superintendent of Insurance and controvert any matters set forth in said renewed complaint aforementioned. Relators were not advised prior to the receipt of the order mentioned in paragraph 19 hereof, that the defendants or either of them, or any other person, claimed that any advertising used by relators was misleading, nor what particular item or items of advertising literature so used were claimed to be misleading. Relators were not furnished with any copy of any complaint in that regard, nor did the defendants or either of them conduct any hearings or receive any testimony on such subject. Relators were furnished no opportunity prior to the denial of their renewal licenses to discuss with the defendants or either of them the claim that relators’ advertising was misleading, nor were they afforded any opportunity to correct such advertising if in fact it was misleading. The only offer to relators to afford them a hearing upon the question of their advertising consisted of a statement made by one of the assistant attorneys general of the state of Ohio to one of relators’ counsel on Wednesday, June 26, 1935, that he would recommend to the Superintendent of Insurance
 
 *361
 
 of the state of Ohio that he suspend the order theretofore issued and give relators a hearing on said advertising question, but if the Superintendent consented thereto, the hearings would have to be completed on or before July 1, 1935, as said Superintendent of Insurance was leaving his office, to be gone approximately one month, on July 2, 1935; that counsel for relators stated that he felt it would be impossible adequately to prepare for a hearing in such a short time; that news of the Superintendent’s order was already public, and that relators and their counsel would have to devote substantially all of their time toward obtaining a review of said order, and, furthermore, that it seemed to him to be useless to have a hearing upon the advertising question before one who had already decided the matter adversely to the relators.”
 

 Paragraph 26 of the stipulations refers to circulars marked Exhibits C and E to I, both inclusive, and sets forth that D is still in use by relators, but that the use of the other circulars was discontinued, as follows:
 

 Exhibit C discontinued November, 1934.
 

 Exhibit E discontinued July, 1935.
 

 Exhibit F discontinued February, 1935.
 

 Exhibit G discontinued February, 1935.
 

 Exhibit H discontinued February, 1935.
 

 Exhibit I discontinued September, 1934.
 

 Paragraph 27 refers to pages 482, 483, 534, 535 and 796 of the fall and winter, 1934, catalog of Sears, Roebuck
 
 &
 
 Company, attached as Exhibits J to M, inclusive. Said catalog is no longer in use and the 1935 catalog is attached as Exhibit 0.
 

 There is a further stipulation in this paragraph to the effect that on January 3, 1935, an employee of the Allstate Insurance Company wrote a letter to Charles E. McCune, a photostatic copy of which is evidenced as Exhibit P. Said employee signed the name of Wil
 
 *362
 
 liam Lowe as Secretary of the Allstate Insurance Company to said letter.
 

 We have examined and analyzed these exhibits for the pupose of determining whether or not the Superintendent of Insurance was warranted in his finding to the effect that the advertising matter contained therein tended to mislead the reading public of the state of Ohio. From these exhibits we take the following excerpts:
 

 “Many thousands of Sears customers are saving substantial sums, safely — year after year — through Allstate, a Sears company.”
 

 “Under the Allstate plan, you buy your automobile insurance as easily and economically as you would buy ordinary merchandise from Sears. No fuss. No trouble at all! You simply send in your application * # * and your policy is issued and delivered. You deal direct.”
 

 “Selling direct (the ‘Sears’ way) reduces our costs. You get all the benefit in lower rates.”
 

 “You have known Sears; Roebuck and Co. for many years. You know, through dealing with Sears, that every article of merchandise is always exactly as represented. You know that Sears method gives you best value. All of these advantages are open to you * * * through the Allstate Insurance Company, a subsidiary of Sears, Roebuck and Co.”
 

 “The full 20% saving which Allstate offers you is possible because Allstate deals direct with you, eliminates all salesmen’s commissions, and gives you the benefit of the company’s low operating costs.” “Allstate Insurance Company, a subsidiary of Sears —with Sears savings, satisfaction, stability.”
 

 “Sears guarantee to satisfy you and save you money. Save money! Buy Allstate automobile insurance.”
 

 “You deal direct with your insurance company.”
 

 
 *363
 

 “Backed by the world’s best known name for fairness
 
 — Sears, Roebuck and Co.”
 

 “For nearly half a century the business of Sears, Roebuck and Co. has -flourished because of the confidence of its customers, who have found by experience that the merchandise and service they receive is always as represented. An ever-increasing number of these customers are buying automobile insurance from Allstate — a Sears-owned company — with the same confidence. They know what kind of treatment they will receive without having to wait until a loss occurs to find out.”
 

 What was the purpose of all this advertising by attractive circular and catalog? No one knows the purpose as well as Sears, Roebuck
 
 So
 
 Company, and it does not tell.
 

 Merchants advertise their wares in order to sell them. They formulate an attractive appeal to the purchasing public. They intend that their advertising shall induce purchases. Persons seeking casualty insurance are primarily interested in the ability of the company with which they insure to meet its obligations. The companies involved herein were worth just what they were worth as corporate entities, and the fact that all the stock of both was owned by Sears, Roebuck
 
 So
 
 Company of itself did not add to their solidarity.
 

 Courts are presumed to know what everybody knows. It is a matter of common knowledge that Sears, Roebuck & Company is one of the most liberal advertisers in the United States’. Sears, Roebuck & Company is reputed as being financially strong and by its system of advertising it sought to leave the impression with the insuring public that its resources were behind the insurance companies involved herein.
 

 No company, domestic or foreign, should be permitted to secure business through the medium of false
 
 *364
 
 advertising. The Superintendent of Insurance arrived at the proper conclusion relative to this advertising, and his action in refusing to renew the licenses of relators was not only free from error but eminently proper.
 

 The Superintendent of Insurance of the state of Ohio in dealing with foreign insurance companies and insurance agents generally, is, by the very nature of his duties, vested with a sound discretion in the exercise of which he is answerable to no one, except in case of its abuse.
 

 Relators insist that Section 644, General Code, refers to insurance agents only. We do not so read it. The first sentence refutes such idea, namely:
 

 “No person shall procure, receive, or forward applications for insurance unless a resident of this state and duly licensed by the superintendent of insurance.”
 

 Surely the word “person” comprehends corporations.
 

 Then let us consider the last sentence of the section, namely:
 

 “While such license remains in force, a foreign company shall be bound by the acts of the person named therein [in the license] within his apparent authority as its acknowledged agent.”
 

 It will be further noted that under this section the agent if licensed is licensed upon the company’s application.
 

 With these exceptions, the section does deal with the licensing of agents. Under this section the Superintendent of Insurance is only required to appoint insurance agents when he is satisfied that the appointee is a suitable person and intends to hold himself out in good faith as an insurance agent.
 

 Neither the insurance company nor the agent is denied substantial rights under this section. A license once granted as provided in this section cannot be re
 
 *365
 
 voked except upon hearing. By this provision the agent is given “his day in court.”
 

 Section 5438, General Code, whatever else may be said of it, is remarkably clear and reasonably concise. It says in so many words that an insurance company authorized to transact business in this state must transact such business through a legally authorized agent in the state, who shall countersign all policies and enter the payment of the premiums upon his record. It provides further that writing or renewal of a policy of insurance in any other manner or form is a violation of the law providing for the payment of taxes by foreign insurance companies transacting business in this state.
 

 This section is a constituent part of the act providing for taxation of foreign insurance companies. See Section 5432
 
 et seq.,
 
 General Code.
 

 There is no discrimination against foreign insurance companies or their agents in either of these sections. These provisions are not unreasonable. The state is entitled to know how much money foreign insurance companies are taking out of the state, and the state is not required to accept the word of the insurance company as proof positive of that fact. The state can set up its own machinery for determining such fact as a part of its regulatory system, and this “set up” will not be disturbed by the courts so long as it is lawful and reasonable.
 

 Due process is not a shield behind which unfair practices may be hidden, and the equal protection clause of the Federal Constitution does not indulge technical distinction nor subtle niceties. The effect of the Fourteenth Amendment to the Federal Constitution upon the exercise of the police power of the state by the state has been passed on by this court.
 
 Company, ex parte,
 
 106 Ohio St., 50, 139 N. E., 204;
 
 Hols-
 
 
 *366
 

 man
 
 v.
 
 Thomas, City Clerk,
 
 112 Ohio St., 397, 147 N. E., 750, 39 A. L. R., 760.
 

 It is not necessary that all persons be made amenable to the
 
 same
 
 laws in order to have equal protection of the law, as equal protection of the law means “the protection of equal laws.”
 
 State, ex rel. Webber,
 
 v.
 
 Felton,
 
 77 Ohio St., 554, 84 N. E., 85.
 

 Since the claim is made that the statutes herein involved run counter to the Federal Constitution it may not be amiss to learn just how the Supreme Court of the United States views the “due process and equal protection” provisions of that instrument. We cite
 
 La Tourette
 
 v.
 
 McMaster, Insurance Commissioner,
 
 248 U. S., 465, 63 L. Ed., 362, 39 S. Ct., 160, and cases referred to in the opinion; also
 
 Nebbia
 
 v.
 
 New York,
 
 291 U. S., 502, 78 L. Ed., 940, 54 S. Ct., 505.
 

 In the case last cited, the court says: “So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a State is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and -to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court
 
 functus officio.”
 

 Relators complain that they have not had their day in court. In other words, that the finding and order of the Superintendent of Insurance of which they complain was made as the result of a hearing
 
 ex parte
 
 at which they were not present and of which they had no notice.
 

 The Federal Constitution never did warrant the use
 
 *367
 
 of the expression “Every man is entitled to his day in court. ’ ’ While under ordinary circumstances the constitutional guarantee as to due process of law implies a formal judicial proceeding, due process is not necessarily judicial process. This is true in regard to matters of taxation and other matters.
 
 Stamton, Pros. Atty.,
 
 v.
 
 Tax Commission,
 
 114 Ohio St., 658,151 N. E., 760.
 

 A man has had his day in court when he has had reasonable notice of hearing and has been provided with a reasonable opportunity to be heard. These rights are not absolute to the extent that they cannot be waived.
 

 The order complained of was made June 21, 1935. In Paragraph 20 of the stipulation of fact it is ascertained that an assistant attorney general stated to one of relators’ counsel on June 26, 1935, that he would recommend to the Superintendent of Insurance of the state of Ohio that he suspend the order made by him and give relators a hearing on the advertising question, but that if the Superintendent consented thereto the hearings would have to be completed on or before July 1, 1935, as the Superintendent was leaving on July 2, 1935, to be gone one month. Counsel for relators stated that he felt it would be impossible adequately to prepare for a hearing in such short time; that news of the Superintendent’s order was already public and that relators and their counsel would have to devote substantially all their time toward obtaining a review of such order, and furthermore that it seemed to him to be useless to have a hearing upon the advertising question before one who had already decided the matter adversely to relators.
 

 The door was partially opened to relators, but they did not seek to take advantage of it. They in effect said “The damage has been done and it is of no use to go further with this superintendent of insurance.”
 
 *368
 
 In other words, relators determined their own case, and they cannot now be heard to complain that they did not have their day in court.
 

 The question as to the number of agents the Superintendent of Insurance may require relators to employ to take care of their business in Ohio does not enter this case. Relators did not keep the promise they made to Superintendent Bowen’s predecessor along this line — and this was one of the reasons for making the order.
 

 The effect of the Ohio statutes in question is to prohibit foreign insurance companies licensed in Ohio from receiving applications for insurance on property in Ohio through the mail at their home offices, directly from citizens of Ohio, but such provision in no wise gives these laws extra-territorial effect. "When foreign insurance companies apply for and are granted licenses to transact insurance business in Ohio they know that the laws of Ohio will be read into their policies and that the laws of Ohio have a right to and will insist that contracts of insurance covering property of its residents located in Ohio be Ohio contracts.
 

 Relators now claim that they have eliminated the advertising complained of and have substantially complied with the requirements of the department of insurance, and that this court should as a matter of first instance require the Superintendent of Insurance to renew their licenses. This we will not do.
 

 Let relators in their new dress present their case to the tribunal authorized by law to entertain it.
 

 It is the judgment of the court that the writs of mandamus herein prayed for be and the same are denied.
 

 Writs denied.
 

 Weygandt, C. J., Matthias, Day and Zimmerman, JJ., concur.
 

 Williams and Jones, JJ., not participating.