OPINION
{¶ 1} Appellant, Charles M., appeals the decision of the Warren County Court of Common Pleas, juvenile division, ordering him to pay psychologist fees and then holding him in contempt for failing to pay the fees. We affirm the decision of the trial court.
 {¶ 2} This court has heard issues surrounding this case three previous times. The fourth issue for review is specific to the psychologist fees and two hearings associated with *Page 2 
the decision to obligate Charles to pay them.
 {¶ 3} Before Charles and his ex-wife, Ann Marie, were divorced, Warren County became involved with the case when allegations arose that the couple's six children were abused and dependent. The two oldest children are the biological children of Charles and Ann Marie and the third is a relative of Ann Marie who the couple adopted. Charles and Ann Marie also adopted a girl from China and then entered into their second international adoption when they adopted two sisters from Africa.
 {¶ 4} As the marriage continued to deteriorate and Charles moved out of the home, allegations surfaced that Charles sexually abused his adopted daughters and physically abused his sons. Also during this time, Ann Marie began a battle with cancer and her health began to decline. Soon after, Ann Marie informed the court of her desire to rescind her adoption of the African children, as she failed to bond with them and was unable to provide for their special health needs.
 {¶ 5} After further investigation, the court found that three of the children were dependent but found the evidence lacking that Charles abused any of the children. During one hearing in particular, one of the African children recanted her prior allegations of sexual abuse and claimed that she had made up the story because Ann Marie had threatened to send her back to Africa if she did not go along with the story of abuse. Because the parties were in the process of divorcing, the juvenile court exercised jurisdiction over the allocations of parental rights and responsibilities of all six children.
 {¶ 6} In 2003, Charles and Ann Marie agreed to an order for the disposition and allocation of parental rights and responsibilities, based primarily on the recommendations of a court-ordered psychologist. The goal was to have one therapist coordinate treatment for the entire family. The agreement also provided that Charles would have custody of the African children, with Warren County Children Services having active participation. Ann Marie took *Page 3 
custody of the four other children and agreed to follow the therapist's recommendations leading to the gradual rebuilding of a positive relationship between the four children and their father.
 {¶ 7} Soon after the agreed entry, Ann Marie filed a notice to relocate to Florida because she wanted to obtain help from her family in her fight against cancer. After a two-day hearing on the issue, a magistrate approved the relocation and the court agreed, over Charles' objections. While Ann Marie remained in Ohio, three of the children eventually moved to Florida, taking up residence with their maternal aunt, while the oldest child moved into the home of a family with whom Charles and Ann Marie were friends. Charles appealed the decision to allow the children to relocate, and this court reversed and remanded the issue because Charles and Ann Marie had agreed to a reunification plan and a relocation without considering all pertinent issues was contrary to achieving that end.
 {¶ 8} While the case was on remand, Anne Marie lost her battle with cancer and passed away in 2006. The court granted emergency custody to the aunt in Florida and to the family friend in Ohio. Charles appealed the decision and this court reversed again and remanded so that the court could consider the issue of custody and support of the children after a full hearing on the matter.
 {¶ 9} Throughout the years represented by these two appeals and remands, the court ordered that the children receive therapy for the turmoil and upheaval the divorce, allegations of abuse, and custody battle had caused. Specifically, Charles continues to assert that the children are suffering from Parental Alienation Syndrome ("PAS"), brought on by Ann Marie's intense anger at him, manifested by her turning the children against their father. The therapy reports submitted to the court make reference to Ann Marie's great anger towards Charles and that the children may have felt the need to vilify their father in an attempt to secure their mother's approval and love. In order to properly identify the existence of PAS and whether or *Page 4 
not the children needed specific treatment before they could be reunified with their father, Charles, Ann Marie, and the court initially agreed that therapy was necessary. While Ann Marie was still alive, the court divided the therapy costs between her and Charles. However, after her death, Charles became fully responsible for paying the therapy bills.
 {¶ 10} From nearly the beginning of the case, Dr. Gene Colina was primarily in charge of the family's therapy. Throughout the course of the sessions with the family members and after the children moved to Florida, Dr. Colina has asserted his belief that the children's negative feelings toward their father are due in part to Ann Marie's behavior and that an eventual unification with Charles was in their best interest. Dr. Colina was also involved in finding a therapist in Florida who would take the children's case and work towards reunification. Ann Marie's sister (the custodial aunt) began to look for a therapist, and finally Dr. Gina Early agreed to take the case.
 {¶ 11} After a while, Charles began to express displeasure over Dr. Early's involvement with the children, asserting that she was not working towards reunification and was fostering the children's "false memories" of sexual abuse by discussing the issue in sessions as opposed to readying the children for reunification. Dr. Colina, after reading Dr. Early's report regarding the children's progress, expressed his own reservations regarding Dr. Early's conclusions.
 {¶ 12} To date, all fees associated with Dr. Colina's therapy services have been paid by Charles, while Dr. Early's fees remain unpaid. Numerous times since the children moved to Florida and Dr. Early began providing therapy, the children's Guardian Ad Litem ("GAL") has forwarded invoices to Charles for the unpaid therapy bills. As of April 25, 2008, the fees for therapy exceeded $4,800 with an additional $3,155 in costs for communicating with Charles and the GAL over the phone, and for preparation of reports and a deposition.
 {¶ 13} The magistrate, in a July 2007 decision, ordered Charles to pay Dr. Early's fees *Page 5 
in full. The court adopted the magistrate's decision and in an interim order, required Charles to pay the fees immediately. Charles appealed the order but this court dismissed the appeal because the interim order was not a final appealable order. The court, once again, ordered Charles to pay the fees and then issued an order for Charles to appear and show cause why he should not be held in contempt for his failure to pay the fees as previously ordered.
 {¶ 14} Charles, who had been acting pro se since he filed a notice of substitution of counsel in July 2007, retained counsel and appeared at the hearing after the court granted him a continuance. The judge heard from Charles' attorney and from the GAL regarding the fees. Charles, claiming the Fifth Amendment protection against self incrimination, declined to be heard at the hearing and did not offer any other evidence as to the payment of Dr. Early's fees.
 {¶ 15} In an order dated October 29, 2007, the court found Charles in contempt for failure to pay the fees and sentenced him to ten days in jail. The court also provided Charles the opportunity to purge the contempt and jail sentence if by November 28, 2007, he provided verification to the court that the fees had been paid. Charles, however, never paid the fees. On December 18, 2007, the court found that Charles had failed to purge the contempt but ordered the ten-day jail sentence stayed because Charles agreed to post an $11,800 bond to secure payment of the fees, pending appeal. It is from this order that Charles now appeals, raising five assignments of error.
 {¶ 16} Assignment of Error No. 1:
 {¶ 17} "FAILURE OF THE TRIAL COURT TO HOLD AN EVIDENTIARY HEARING ON THE ISSUE OF THE PAYMENT OF THE FEES IS IMPROPER AND VIOLATES [CHARLES'] RIGHTS TO DUE PROCESS."
 {¶ 18} In his first assignment of error, Charles argues that the court erred by deciding the fees issue because it rendered the decision after a pretrial instead of an evidentiary *Page 6 
hearing. This argument lacks merit.
 {¶ 19} "A man has his day in court when he has been afforded a reasonable opportunity to be heard after a reasonable notice of such hearing." State ex rel. Allstate Ins. Co. v. Bowen (1936),130 Ohio St. 347, paragraph five of the syllabus. An appellate court independently reviews the record to determine, as a matter of law, if the party received notice and a reasonable opportunity to be heard. Sprouse v.Miller, Lawrence App. No. 07CA32, 2008-Ohio-4384.
 {¶ 20} Inherent in the Fourteenth Amendment to the United States Constitution and Section 16, Article I of the Ohio Constitution, those whose interests in life, liberty, or property are adversely affected by a government action are entitled to due process. State ex rel. PlainDealer Publishing Co. v. Floyd, 111 Ohio St.3d 56, 2006-Ohio-4437, ¶ 45. Procedural due process requires the government to give reasonable notice and a meaningful opportunity to be heard on the matter.Atkinson v. Grumman Ohio Corp. (1988), 37 Ohio St.3d 80, 85; Crist v.Battle Run Fire Dist. (1996), 115 Ohio App.3d 191, 197.
 {¶ 21} "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. * * * The notice must be of such nature as reasonably to convey the required information, * * * and it must afford a reasonable time for those interested to make their appearance." Bradford ForestProducts, Inc., v. Oborn Harwood Products, Inc., Hardin App. No. 6-99-10, 2000-Ohio-1909, 6, quoting Mullane v. Central Hanover Bank Trust Co. (1950), 339 U.S. 306, 314. Reasonable notice of a hearing informs the parties of the subject matter of the hearing so that the parties may ready themselves to offer evidence and testimony, and to formulate arguments germane to the hearing's subject matter and purpose.State ex rel. Steinbrunner v. Indus. Comm., Franklin App. No. 05AP-626,2006-Ohio-3444, ¶ 16. *Page 7 
The opportunity to be heard must occur at a meaningful time and in a meaningful manner. Floyd at ¶ 45.
 {¶ 22} Charles asserts that he was denied due process because the court never held an evidentiary hearing before it ordered him to pay the therapy fees. Specifically, Charles contends that the hearing in which the court addressed the issue was a pretrial hearing and he was therefore denied a chance to be heard. Charles also contends that the decision to obligate him to pay the fees was the result of an ex parte discussion because he did not attend the hearing. However, after reviewing the record, Charles was afforded his due process rights and the decision was not a result of an ex parte order.
 {¶ 23} While Charles argues that the hearing was a pretrial, the court specifically gave Charles notice that the hearing on July 10, 2007 would also include the therapy fee issue. Charles references the July 17, 2007 entry in which the magistrate stated "this matter came before the Court on July 10, 2007 for a pretrial." Charles then details what the rules of procedure permit in a pretrial hearing to demonstrate that a court cannot consider substantive matters. Although the opinion references the hearing as a pretrial, it is clear from the record that Charles had notice that the July 10th hearing was more than a pretrial hearing and that it included the therapy fee issues.
 {¶ 24} On June 19, 2007, the GAL moved to require Charles to pay for the counseling fees. In the motion, the GAL references multiple letters and correspondences between Charles, counsel, the GAL, and Dr. Early in which the fees are discussed. After Charles had not paid the fees, the GAL filed the motion moving the court to order Charles to pay them. On June 20, 2007, the court sent Charles a document entitled "NOTICE OF HEARING." The notice began by saying" Along with the Pretrial currentlyset for Tuesday, July 10, 2007 @ 10:00 a.m., the Motion of the Guardian Ad Litem and Counsel for the [Children] to Require [Charles] to Pay for the Counseling Services of Dr. Gina Early and the Supplement of the *Page 8 
Motion of the Guardian Ad Litem to Pay the Fees of Dr. Gina Early will be heard * * *." (Emphasis in original.)
 {¶ 25} The hearing commenced on July 10th and although Charles was not in attendance, he was represented by counsel so that the hearing was not ex parte.
 {¶ 26} While Charles points to the magistrate's decision and reference to the July 10th pretrial, the notice and hearing had already been executed and the identification of the hearing as a pretrial in the opinion had no diminishing impact on Charles' already-fulfilled due process rights.
 {¶ 27} Having found that Charles was afforded reasonable notice and a chance to be heard on the therapy fees, his due process rights were not violated and his first assignment of error is overruled.
 {¶ 28} Assignment of Error No. 2:
 {¶ 29} "THE TRIAL COURT ERRED IN ORDERING [CHARLES] TO PAY THE FEES OF DR. EARLY BECAUSE THERE IS NO COMPELLING INTEREST IN SUCH AN ORDER FOLLOWING THE DEATH OF MOTHER."
 {¶ 30} In his second assignment of error, Charles essentially argues that after Ann Marie's death, the juvenile court no longer had jurisdiction over the case and should not have ordered him to pay the fees. There is no merit to his argument.
 {¶ 31} R.C. 2151.23 vests jurisdiction in the juvenile court to hear cases in certain circumstances such as when children are ruled dependent or there has been a crime between an adult and a child. Warren County first became involved in this case when the allegations of sexual abuse arose. Also, at the beginning of the case, three of the children were designated dependent children and both Charles and Ann Marie used the juvenile court as a means to resolve issues regarding their children. Charles asserts to this court that the juvenile court lacked the jurisdiction to determine the therapy fee issue because Ann Marie's *Page 9 
death left him the children's only surviving parent. However, Charles only has custody of two of his children, two have reached the age of majority, and the other two minor children are in the custody of Ann Marie's sister in Florida. The juvenile court has continuing jurisdiction to determine matters involving these children, including the therapy fees, as part of Charles' continuing child support obligations.
 {¶ 32} Additionally, Charles has filed multitudes of motions, objections, and memorandums with the juvenile court and only now questions its ability to hear the case. Nonetheless, the court's jurisdiction was proper at its inception and it remains proper given the fact that there are still unresolved issues regarding the children.
 {¶ 33} Having had the proper jurisdiction, the court found that Charles was responsible for the therapy fees. Specifically, after the July 10th hearing, the magistrate issued an opinion in which he determined that Charles was responsible for the fees, and the trial court adopted that finding when it overruled Charles' objections to the magistrate's decision.
 {¶ 34} "Matters involving child support are reviewed under the abuse-of-discretion standard." S.H. v. C.C., Madison App. No. CA2006-12-051, 2007-Ohio-4359, ¶ 35, citing Booth v. Booth (1989),44 Ohio St.3d 142, 144. More than mere error of judgment, an abuse of discretion requires that the court's attitude was unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 35} In its decision, the court references multiple times that Charles made filings with the court in which he took responsibility for the bill and then reasoned that as the sole surviving parent of the children, Charles was obligated to pay 100 percent of the children's health care costs. The court, therefore, ordered that Charles pay the fee, regardless of his discontent over Dr. Early's methods. We find no error in this conclusion.
 {¶ 36} We note initially that the record does not contain a transcript of the July 10th hearing. Therefore, we will presume regularity of the proceedings and determine that the *Page 10 
court properly weighed all available evidence before it ordered Charles to pay the fees. See State v. Ballinger, Warren App. No. CA2003-07-069, 2004-Ohio-4984 (presuming the regularity of proceedings below when record lacked transcript for review). While lacking the transcript, the record does contain numerous filings where Charles beseeched the court to order therapy for the children in Florida. Time after time, Charles demanded that the children receive therapy and implored both the court and the GAL to procure the necessary help to improve the mental health of the children. Once the children began seeing Dr. Early, her fee became a health care cost that the court was correct in assigning to Charles. See Enriquez v. Enriquez (Dec. 8, 1995), Lucas App. No. L-94-252 (affirming decision of trial court to order appellant to pay appellee's psychologist fees as part of his support obligation).
 {¶ 37} Also on multiple occasions, Charles accepted responsibility for the fees. Soon after the fee hearing on July 10th, Charles filed objections to the magistrate's decision and stated that, "Father agrees to pay the therapist per the Court's original Order for Disposition," and in another motion to reconsider, Charles stated, "Father hereby pledges that Dr. Early will be appropriately compensated following the fulfillment of due process * * *."
 {¶ 38} While it is obvious that Charles does not agree with the services that Dr. Early has provided, he is not permitted to withhold payment until he becomes satisfied that Dr. Early is pursuing a course of therapy that he personally champions. Instead, it was within the court's discretion to order Charles to pay the fees and its decision to do so was not arbitrary, unreasonable, or unconscionable. Having found no abuse of discretion, Charles' second assignment of error is overruled.
 {¶ 39} For ease of discussion, we will address Charles' next two assignments of error together.
 {¶ 40} Assignment of Error No. 3:
 {¶ 41} "THE CONTEMPT PROCEEDINGS AGAINST [CHARLES] WERE *Page 11 
CONDUCTED IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS AND DEPRIVED HIM OF A FAIR HEARING."
 {¶ 42} Assignment of Error No. 4:
 {¶ 43} "THE TRIAL COURT ERRED IN FINDING [CHARLES] IN CONTEMPT OF COURT BECAUSE THERE WAS NO EVIDENCE PRESENTED AT THE HEARING."
 {¶ 44} Much like his first assignment of error, Charles asserts that he was denied due process because the court did not hear evidence before it found him in contempt. This argument lacks merit.
 {¶ 45} "Contempt of court is defined as disobedience of an order of a court. It is conduct which brings the administration of justice into disrespect, or which tends to embarrass, impeded or obstruct a court in the performance of its functions." Hueber v. Hueber, Clermont App. Nos. CA2006-01-004, CA2006-02-019, CA2006-02-020, 2007-Ohio-913, ¶ 16, citingWindham Bank v. Tomaszczyk (1971), 27 Ohio St.2d 55, paragraph one of the syllabus.
 {¶ 46} A court may find the offending party in contempt for either direct or indirect actions that constitute disobedience to an order.Pirtle v. Pirtle, Montgomery App. No. 18613, 2001-Ohio-1539. While a direct contempt occurs within the court's presence or with the court's personal knowledge of facts relating to the act, indirect contempt is "misbehavior that occurs outside the actual or constructive presence of the court." Id. at 6. One accused of indirect contempt is entitled to a "hearing on the charge, at which the court must investigate the charge,hear any answer or testimony that the accused makes or offers, and then determine whether the accused is guilty." Id. (Emphasis added.)
 {¶ 47} Although punishment is inherent in contempt, courts will categorize the penalty as either civil or criminal based on the character and purpose of the punishment. Brown v. Executive 200,Inc. (1980), 64 Ohio St.2d 250. While criminal contempt is characterized by *Page 12 
an unconditional prison sentence, civil contempt is marked by remedial or coercive punishment, doled out for the "benefit of the complainant." Id. at 253. Another hallmark of civil contempt, incarceration as a punishment is conditional so that "the contemnor is said to carry the keys of his prison in his own pocket." Id. Because a civil contempt sanction is coercive in nature, the contemnor must have the opportunity to purge his contempt and once done, any sanctions will be discontinued because compliance has been achieved. In re Cox (Dec. 23, 1999), Geauga App. Nos. 98-G-2183, 98-G-2184.
 {¶ 48} Because deprivation of liberty or property is implicated in a contempt charge, one accused of an indirect civil contempt must be afforded due process before a court can order punishment. Poptic v.Poptic, Butler App. No. CA2005-06-145, 2006-Ohio-2713. As previously stated, the due process requirements will be fulfilled when the accused has been afforded adequate notice and a chance to be heard. Crist v.Battle Run Fire Dist. (1996), 115 Ohio App.3d 191, 197. "More specifically, due process considerations require that the alleged contemnor `have the right to notice of the charges against him, a reasonable opportunity to defend against or explain such charges, representation by counsel, and the opportunity to testify and to call other witnesses, either by way of defense or explanation.'"Poptic at ¶ 8, citing Miller v. Waller, Franklin App. No. 04AP574,2004-Ohio-6612, ¶ 7.
 {¶ 49} In addition to traditional due process requirements, R.C. 2705.03 requires that an accused contemnor be given an opportunity to be heard. During the hearing, the court is charged with investigating the charge, hearing the testimony, answer, or explanation the accused offers, and then determining guilt or innocence. Pirtle at 6.
 {¶ 50} "To support a contempt finding, the moving party must establish, by clear and convincing evidence, the existence of a valid court order, that the offending party had knowledge of the order and that the offending party violated such order." Hueber, 2007-Ohio-913, ¶ 16. Clear and convincing evidence, though it does not rise to the level of beyond a *Page 13 
reasonable doubt, is such that will "produce in the mind of the tier of fact a firm belief of conviction as to the facts sought to be established." Id. Once the movant establishes a prima facie case of contempt, the burden then shifts to the contemnor to prove his inability to comply with the court order. Keeley v. Keeley (July 21, 1997), Clermont App. No. CA97-02-013. However, the inability which excuses compliance cannot be self-imposed, fraudulent, or due to an intentional evasion of the order. Id.
 {¶ 51} A reviewing court will not disturb a lower court's finding of contempt absent an abuse of discretion so that the appellant must demonstrate that the trial court's finding was arbitrary, unreasonable, or unconscionable. Id.
 {¶ 52} Initially, we note that Charles was accused of an indirect civil contempt. Because the nonpayment of therapy fees occurred outside the actual presence of the court and was not something that the court knew of through its first-hand account, the contempt was indirect. The contempt was civil in nature in that the reason the court found Charles in contempt was not paying Dr. Early for services rendered. The court gave Charles the chance to purge his contempt by paying the fees and he had the opportunity to avoid the sentenced incarceration by doing so. Therefore, this court will analyze the case at bar mindful of the due process requirements inherent in an indirect civil contempt proceeding.
 {¶ 53} Although Charles asserts that he was denied due process and the court erred by finding him in contempt, a review of the record indicates otherwise. The court overruled Charles' objections to the magistrate's decision ordering him to pay Dr. Early's fees. In its September 14, 2007 order requiring Charles to pay the therapy fees, the court ordered that Charles provide proof of payment or appear to show cause why he should not be held in contempt for failing to pay as ordered. Notice of this valid order and contempt hearing was sent to the parties on September 17, 2008 and nothing in the record indicates that Charles did not receive it. The hearing was set for October 18, 2007 and the court granted Charles a *Page 14 
continuance until October 24, 2007 upon his request. See Poptic
at ¶ 9, (stating that notice is reasonable in an indirect contempt proceeding when the accused contemnor is given 30 days notice or more). It is clear from the record that Charles received notice of the valid court order and knew of it, as he obtained counsel to represent him during the contempt phase of the proceedings.
 {¶ 54} At the October 24th hearing, Charles was represented by counsel and the court heard the contempt issue. Essentially, Charles asserts that the court could not have held him in contempt because there was no evidence presented at this hearing that would prove by clear and convincing proof that he was in contempt. We disagree.
 {¶ 55} The court opened the hearing by stating "we're here today because the court has issued an order that [Charles] appear and show cause why he shouldn't be held in contempt for failing to pay the fees of Dr. Early." The court then instructed Charles' counsel to explain why he should not be held in contempt. After explaining that Charles was going to exercise his right against self-incrimination, counsel proceeded to explain that Charles had issue with Dr. Early and that he was willing to "work out some kind of agreement" for payment once Dr. Early agreed to get on the "same page" as Charles.
 {¶ 56} After the court allowed the GAL to speak on the issue, the court asked Charles' counsel specifically "have the fees been paid?" to which counsel responded "I don't believe they have." The court then made reference to a pro se filing in which Charles stated that he agreed to pay the therapist per the court's original order. As discussed previously, the court also had record of other pro se filings in which Charles recognized that he took responsibility for the fees and agreed to pay them. Counsel responded that Charles would pay the fees once Dr. Early began to behave in accordance with his desire to be reunified with his children. Counsel later stated, "I think that [Charles], at least in what I've seen of the filings, that [Charles] is setting forth his position that if she complies with the court's orders and she *Page 15 
complies with * * * her own association's guidelines with regard to the AAMFT[1] and she cooperates with providing the insurance information that he would be more than happy to pay."
 {¶ 57} Near the end of the hearing, the GAL offered multiple examples of correspondence in which Charles agreed to pay the fees once Dr. Early came around to his way of thinking and made reference to the pro se filings in which Charles acknowledged that the fees had not been paid but would pay them in accordance with court orders. In response to the GAL's argument, Charles' counsel then stated: "I mean, we're getting into records that I don't think are authenticated, bills that I don't even have, second and third hand conversations about what was said while somebody was on the phone. Those are not matters that this court can consider as an evidentiary matter in the course of the contempt proceeding." The court then replied, "You're right about that, but as [the GAL] says the issue is whether Dr. Early has been paid or not. There's an order that she be paid. I don't see any reason why that order was not a valid order when made. I've not heard a good excuse as to why Dr. Early had not been paid, therefore I'm going to find you in contempt * * *". Before the court closed the hearing, however, it asked counsel if there was anything further. Counsel replied "no sir" and the hearing concluded.
 {¶ 58} Charles' choice not to present testimony or evidence regarding whether or not the fees had been paid did not deny him a proper hearing. Other Ohio courts have been faced with similar issues. In In re Cox
(Dec. 23, 1999), Geauga App. Nos. 98-G-2183, 98-G-2184, the Eleventh Appellate District affirmed a finding of contempt because the appellant had continually disobeyed a court order which instructed her to abide by a case plan developed by social services. During the show cause hearing, the appellant was given the *Page 16 
opportunity to respond to the contempt allegations but offered no explanation for her failure to abide by the court order. Also during the hearing, appellant's counsel conceded that appellant had violated the case plan as alleged by appellant's case worker during a status hearing that occurred prior to the contempt hearing. At no time did appellant's counsel make a formal objection to the use of information provided outside the ambit of the contempt hearing, and instead, admitted the violation and asked for leniency.
 {¶ 59} Similar to the case at bar, the juvenile court in In reCox conducted the hearing but did not take substantive evidence. On appeal, the Eleventh District noted especially that "the transcript reveals that appellant was never called to the witness stand" nor was she questioned about her violations of the court order. Id. at *6. Further, the appellee never called any witnesses and the juvenile court treated the show cause hearing merely as "the chance to explain why she should not be held in contempt of court." Id.
 {¶ 60} In affirming the finding of contempt, the court held that "notwithstanding the lack of substantive evidence introduced during * * * the hearing, there is no record of any formal objection to the use of the information brought forth during the July status conference. Indeed, as mentioned previously, appellant's counsel conceded at the show cause hearing that she was in violation of the juvenile court's prior orders. * * * After conceding these points, counsel essentially asked the juvenile court to allow appellant to purge herself of the contempt by coming into compliance with the case plan. * * * Given this strategy, counsel could hardly plead for further time for appellant to comply without first acknowledging her misdeeds." Id. at *7.
 {¶ 61} As in In re Cox, Charles never formally objected to the court considering evidence raised in the past and the ample evidence on record that he was in violation of the court order by not paying the fees. Additionally, instead of offering evidence or testimony that the fees had been paid, which would have proven that he was not in contempt, Charles chose *Page 17 
to offer reasons why he should not have been obligated to pay the fees in the first place. However, the validity of his responsibility to pay had been determined at the first hearing and was therefore not at issue at the contempt hearing.
 {¶ 62} Much like In re Cox, Charles' counsel had to admit to the violation before he could explain under what circumstances Charles would pay. By discussing Charles' expectations from Dr. Early and that he would pay when she got on the "same page" as him, Charles was admitting that the fees had not been paid. This concession constitutes the clear and convincing evidence necessary to establish Charles' contempt.
 {¶ 63} After the GAL successfully established the prima facie case of contempt by demonstrating that the valid order existed, that Charles knew about it, and that the fees had not been paid, the burden then shifted to Charles to explain to the court why he was not able to pay. The hearing transcripts indicate on multiple occasions that Charles was willing and able to pay the fees, except that he did not agree with the way that Dr. Early was progressing with the case. Instead of offering the evidence necessary to demonstrate that he was not in contempt, or why he was unable to pay the fees, Charles used the hearing as another outlet to express his displeasure over Dr. Early's professional choices. This strategy, however, did not deny him the right to a hearing, nor did it excuse his contempt.
 {¶ 64} Charles now cites Pirtle v. Pirtle, 2001-Ohio-1539, in which the Second Appellate District reversed a finding of contempt because the appellant was denied an adversarial hearing. Charles compares his case with Pirtle where the appellant was found guilty of an indirect civil contempt without first having had the benefit of an adversarial hearing. However, the Pirtle case is easily distinguishable from the one at bar.
 {¶ 65} The court which found the appellant[2] in contempt never held any hearing at all. *Page 18 
Instead, the court, based on a letter from the Clerk of Courts establishing that the appellant had failed to comply with local court rules, demanded that appellant show cause in writing why he should not be held in contempt. The appellant then filed a memorandum in which he explained his reason for violating the rules. The court, when finding appellant in contempt, ordered that the explanation showing cause be stricken from the record because it contained scandalous and unsubstantiated allegations against the court. The appellant, therefore, was denied any hearing on the matter and his only explanation was stricken from the record.
 {¶ 66} In the case at bar, however, Charles was afforded a hearing at which he was given a full opportunity to show cause why he should not be held in contempt. His unwillingness or inability to produce testimony or evidence demonstrating he had complied with the order or was unable to pay the fees was not tantamount to being denied a chance to be heard on the issue, as was the case in Pirtle.
 {¶ 67} Having found that Charles was afforded due process and that the court had clear and convincing evidence of his guilt, Charles' third and fourth assignments of error are overruled.
 {¶ 68} Assignment of Error No. 5:
 {¶ 69} "THE TRIAL COURT ERRED IN ORDERING [CHARLES] TO A TERM OF INCARCERATION FOR THE NONPAYMENT OF A DEBT."
 {¶ 70} In his final assignment of error, Charles argues that the court erred by sentencing him to jail because Ohio law forbids incarceration as punishment for nonpayment of debt. There is no merit to this argument.
 {¶ 71} Section 15, Article I, of the Ohio Constitution prohibits a court from ordering imprisonment as a punishment for civil debt. The Ohio Supreme Court has held that a duty to pay court costs is considered a civil debt because it arises from an implied contract with the court, so that a failure to pay court costs cannot be punished via incarceration. In re Bailey, *Page 19 
Hamilton App. No. C-060700, 2007-Ohio-4192, citing Strattman v.Studt (1969), 20 Ohio St.2d 95. However, "an obligation to pay child support is not a `debt' within the meaning of that term in Section 15, Article I of the Ohio Constitution. Because this obligation does not fall within the scope of Section 15, Article I, an order to pay child support may be enforced by means of imprisonment through contempt proceedings * * *." Cramer v. Petrie, 70 Ohio St.3d 131, 1994-Ohio-404, paragraph one of the syllabus.
 {¶ 72} As previously referenced, a court has the discretion to award mental health care fees as part of support from one spouse to another and from parent to child. See Enriquez v. Enriquez (Dec. 8, 1995), Lucas App. No. L-94-252 (affirming decision of trial court to order appellant to pay appellee's psychologist fees as part of his spousal support obligation); and Gulde v. Gulde (Mar. 7, 1985), Darke App. No. 1129, (noting that awarding therapy fees was within the trial court's proper jurisdiction because it could determine matters of child support).
 {¶ 73} Here, while Charles argues that the therapy fees are a court cost, the therapy fees were designated part of Charles' child support obligation. The record is clear that all interested parties agreed that therapy was necessary in order to ensure the mental health of the children. Charles, especially, championed therapy as an integral part of his children's well-being and any future hopes of rebuilding a relationship with him. The court was within its discretion to obligate Charles to pay the fees as part of his ongoing child support.
 {¶ 74} After Charles did not pay, and was found in contempt for his refusal to pay Dr. Early's fees, the court sentenced Charles to ten days in jail, but also provided him the opportunity to purge his contempt by providing proof that the fees were paid by November 28, 2007. In a filing on December 18, 2007, the court found that Charles had failed to purge himself of the contempt because he did not pay the fees as ordered. While the court stayed the ten-day sentence because Charles posted a supersedeas bond for $11,800 to cover the fees, it had the authority to order Charles to serve the jail sentence. *Page 20 
 {¶ 75} Because the court had the authority to sentence Charles to a jail sentence as punishment for his contempt, his final assignment of error is overruled.
 {¶ 76} Judgment affirmed.
BRESSLER, P.J., and POWELL, J., concur.
[1] American Association for Marriage and Family Therapy.
[2] Appellant was the divorce attorney for the father and was trying to get an emergency order to stop the mother from taking the children out of town. *Page 1