[Cite as *In re C.L.W.*, 2022-Ohio-1273.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

|                        |     |                                    |
| ---------------------- | --- | ---------------------------------- |
| IN RE:                 | :   |                                    |
| C.L.W.                 | :   | CASE NO. CA2021-05-013             |
|                        | :   | O P I N I O N<br>4/18/2022         |
|                        | :   |                                    |
|                        | :   |                                    |
|                        | :   |                                    |

APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 2020 JG 25788

Taft, Stettinius & Hollister LLP, and Aimee L. Keller, for appellant.

Law Office of William J. Rapp, and Joshua R. Crousey, for appellee.

**BYRNE, J.**

{¶1}   Mother appeals from the decision of the Clermont County Court of Common Pleas, Juvenile Division, which held her in contempt of court and imposed two purge conditions, one of which she argues violated her due process rights. For the reasons below, we affirm the juvenile court's finding of contempt but modify the order with respect to the court's challenged purge condition, which we find was void.

## I. Facts and Procedural History

### A. Background Facts

{¶2}   Mother and Father were never married but had a child together, C.W.  The parties have a shared parenting plan for C.W.  At the time relevant to this appeal, C.W. was eight years old.

{¶3}   The shared parenting plan provided that C.W. would spend spring breaks with Mother and Father in alternating years.  According to Father, Mother withheld C.W. from him during the child's 2020 spring break.  As a result, in early 2021, Father emailed Mother requesting permission for C.W. to spend the upcoming 2021 spring break with him to make up for the missed 2020 spring break.  Father indicated that he and his family had planned a road trip and other activities.  Mother failed to provide an answer for over two weeks, despite Father's repeated follow-up messages.  Mother finally responded, stating that she had decided that C.W. would not be allowed to spend the 2021 spring break with Father.

### B. Father's Motion for Parenting Time

{¶4}   Dissatisfied with Mother's response, Father moved the juvenile court for an order granting him parenting time during C.W.'s upcoming 2021 spring break.  He attached the emails exchanged with Mother.

{¶5}   The parties subsequently appeared before the juvenile court for a hearing. Father testified, as did the child's guardian ad litem (GAL).  Mother did not testify.  Instead, after Father's case, Mother's counsel requested that the court interview C.W. in camera.

{¶6}   The court interviewed C.W. several days later.  The next day, March 9, 2021, the court issued a decision finding that it was in C.W.'s best interest that Father have parenting time during C.W.'s spring break. The court indicated it had "significant concerns" following the in camera interview.  The court found that C.W.'s comments, demeanor, and phraseology lent credence to concerns raised by the GAL that Mother was coaching the

child. Accordingly, the juvenile court ordered that Father have parenting time during the child's two-week spring break between March 22 and April 2, 2021. It also directed that "the commencement and termination of the parenting time shall be in accordance with the terms of the [shared parenting plan]." Mother was required to transfer C.W. to Father at 6:00 p.m. on Friday, March 19, 2021.

### C. Father's Motion for Contempt

{¶7} The attempt to transfer C.W. from Mother to Father on the required date failed, as will be described further below. After the transfer failed, Mother took C.W. to Florida with only one hour's notice to Father and without his consent. The day after Mother took C.W. to Florida, Father filed an emergency motion for custody and motion for contempt. Father alleged that Mother should be held in contempt of court for what occurred at the attempted transfer and afterward. The matter proceeded to a hearing.

### D. Contempt Hearing Testimony

### 1. Father's Testimony

{¶8} At the hearing on Father's motion for contempt, Father testified that on Friday, March 19, 2021, the date indicated by the court's order, he arrived at the agreed transfer location, a Meijer parking lot. Mother was already there.

{¶9} When Father approached Mother's vehicle, Mother was outside the vehicle and had opened the back passenger door where C.W. was sitting. But she positioned herself between Father and C.W., restricting his access to the child. C.W. kept stating, "I don't want to go" or "I'm not going."

{¶10} Father asked Mother to encourage C.W. to go with him. She then turned back to C.W. and, in a sarcastic voice, stated, "the Judge said you have to go with Daddy." The child continued to refuse to go. Father then asked Mother to take off C.W.'s seatbelt and remove her from the car, but Mother replied, "no, we're not doing that."

{¶11} Father then called the GAL and explained the situation. The GAL spoke to C.W. on the phone. Father then called his wife and asked her to speak with Mother. Father then asked Mother if he could speak with C.W. privately. Mother refused to allow him to speak with C.W. privately. She continued to stand between C.W. and Father.

{¶12} Father then called the police department, and an officer responded quickly. Father showed the officer the court order granting him parenting time over spring break and explained that he had been unable to speak with C.W. privately since arriving.

{¶13} The officer commanded Mother to move away from the vehicle and to let Father speak to C.W. Mother refused. The officer then had to raise his voice significantly and asked Mother whether she was refusing to let Father take C.W. Mother screamed at the officer, stating, "I'm afraid he's going to snatch her out of here and waltz away." However, she finally relented and moved away from the vehicle.

{¶14} Father was then able to speak to C.W. one-on-one, but they did not have privacy because Mother remained nearby and could hear the conversation between C.W. and Father. C.W. continued repeating, "I'm not going." Father decided against attempting to physically remove C.W. from the car because he was not sure how doing so would impact her. He also stated that he was "afraid of what legally could have been done with me reaching into their vehicle and unbuckling [C.W.]," and that he did not know what the "legal ramifications" would be if he did so. After this had been going on for about an hour, Father decided to leave. He drove to a different area of the parking lot and parked his car. Then Mother and her husband drove away with C.W.

{¶15} Father testified that two days later, on Sunday, March 21, he received a text message from Mother stating that she was flying to Florida with C.W. The exchange went as follows:

Mother: We are flying to Florida in about an hour.

- 4 -

Father: I do not consent to you taking [C.W.] out of the state on my schedule[d] parenting time.

[Approximately 3 hours later]

Mother: We have landed.

{¶16} Almost a week later, on Saturday, March 27, 2021, Mother texted Father that they were flying home and later texted that they landed. Mother appears to have agreed with Father picking up C.W. near the end of C.W.'s spring break, on Wednesday, March 31, 2021. Father and his brother picked up C.W. from Mother's home on that day. C.W. ran out, gave both a big hug, and they left.

## 2. Guardian Ad Litem's Testimony

{¶17} The GAL testified about her phone call with C.W. during the failed transfer at Meijer. The GAL asked C.W. why she did not want to go with her Father. C.W. just responded, "I just don't want to go." Despite repeated requests, C.W. could not give any reason for not wanting to go with Father. The GAL found this unusual, as C.W. was normally very open and talkative with the GAL.

{¶18} After the GAL learned that Mother had taken C.W. to Florida, she emailed Mother and Mother's counsel to determine whether it was true that they left the state, and if they had, she requested that Mother return C.W. to Ohio immediately. Neither Mother nor Mother's counsel responded.

{¶19} The GAL added that she knew Mother was making statements to C.W. that gave the GAL "great concern" that Mother was interfering with C.W.'s relationship with Father and that Mother had interfered with Father's planned parenting time during C.W.'s spring break by making such statements.

## 3. Mother's Testimony

{¶20} Mother testified that she did everything she could to get C.W. to go with

Father. This included telling C.W. that the judge ordered her to go on spring break with Father and asking, "don't you want to ride in that rental car?" She was referring to Father's rental vehicle.

{¶21} Mother testified that Father apologized to C.W. and said that she did not have to go with him on her spring break if she did not want to. Mother stated that Father had 15 to 20 minutes of time alone with C.W. and that ultimately, Father left the exchange location first.

{¶22} Mother testified that her plan was to drop C.W. off with Father and then to fly to Florida with her family the following Sunday. If C.W. was not going with them to Florida, Mother still planned to go to Florida. Mother testified that she did not have a plane ticket for C.W. at the time of the failed exchange on Friday.

{¶23} On cross-examination by Father's counsel, Mother conceded that she did not actually need to buy a plane ticket for C.W. because Mother's family flew to Florida on her family's private plane. Mother further admitted that when C.W. was refusing to go with Father, she did not tell C.W. that she would be disciplined in some way. In fact, Mother confirmed that she would not discipline C.W., asking rhetorically, "am I bound by the Court to discipline my child for having an issue with spending time with her dad?"

{¶24} On cross-examination by the GAL, Mother denied telling C.W. that if she spent time with Father, she would miss out on family fun with Mother's family. However, Mother did admit to telling C.W. that "we weren't going to cancel things" in Florida if C.W. was with Father and that "we don't just stay home and watch TV when she's not with us."

### E. Juvenile Court's Decision

{¶25} On April 5, 2021, the juvenile court issued a written decision. The court recounted the facts surrounding the failed transfer and the circumstances involved in Mother taking C.W. out of state. In assessing whether Mother was in contempt of court, the

court recited Mother's testimony about the Florida trip. The court observed that Mother had testified that she had no plans to take C.W. to Florida for spring break. The court also observed that Mother "stated under oath that she had not said anything to the minor child about the trip to Florida." (This description of Mother's testimony was not quite accurate, as discussed below). The court observed that Mother had attempted to bolster her claim of not planning to take C.W. to Florida by her testimony about not having a plane ticket for C.W. The court noted, however, that Mother ultimately admitted under cross-examination that there was no need to purchase a plane ticket because the family would be flying on their private plane.

{¶26} The court found that Mother's testimony about the Florida trip was "absolutely controverted" by C.W.'s statements during the in camera interview. The court stated that C.W. "recited all the salient details about the Florida trip, including but not limited to the mode of transportation and the specific destination." The court found that these facts called into question the credibility of Mother's entire testimony. To be clear, the court conducted its in camera interview of C.W. before the failed transfer and before Mother took C.W. to Florida, so C.W.'s statements about the trip were not recollections of a past event.

{¶27} Continuing, the court rejected Mother's argument that she was not in contempt because Father was the first to leave the Meijer parking lot and therefore waived his parenting time. The court found this position "untenable at best, and absurd at worst." The court found that Father acted in a "reasonable and prudent manner" and at all times sought to exercise his court-ordered parenting time using appropriate efforts.

{¶28} The court found that Mother was obligated to do more than "merely encourage" C.W. to go with Father. In fact, the court questioned whether Mother's statements and actions at the exchange even met the definition of "merely encourage." The court found that there was clear and convincing evidence establishing that Mother willfully

violated the court's March 9, 2021, order.

**{¶29}** The court therefore found Mother in contempt of court. The court ordered Mother incarcerated for 30 days in the Clermont County Jail, beginning August 11, 2021, at 10:00 a.m. The court further ordered Mother to appear on August 11, 2021, at 9:00 a.m. for a review hearing. The August 11 date was more than four months out from the date of the court's order.[1]

**{¶30}** The court stated that Mother could purge the contempt finding and avoid jail by (1) providing Father with 14 days of uninterrupted parenting time on dates of his choosing, and (2) complying with the terms and conditions of the parties' parenting time schedule set forth in the shared parenting plan from the date of the order until the date of the review hearing.

**{¶31}** Mother appealed, raising two assignments of error.

## II. Law and Analysis

**{¶32}** Assignment of Error No. 1:

**{¶33}** THE TRIAL COURT ERRED WHEN IT FOUND MOTHER TO BE IN CONTEMPT OF COURT.

**{¶34}** Mother argues that the juvenile court abused its discretion in finding her in contempt because the court erroneously concluded that Mother testified that she had not told C.W. about the Florida trip. She argues that the court's contempt finding was primarily based on the erroneous conclusion that she lied under oath on this specific point, and that this erroneous conclusion "tainted the court's consideration of the case."

---

1. A court of appeals may take judicial notice of court proceedings relevant to mootness. *In re Adoption of C.E.S.*, 12th Dist. Butler Nos. CA2020-07-069, CA2020-07-070, and CA2020-07-071, 2020-Ohio-6902, ¶ 3. A court of appeals may also look outside the record to determine whether an appeal is moot. *State ex rel. Nelson v. Russo*, 89 Ohio St.3d 227, 228 (2000), citing *Pewitt v. Lorain Corr. Inst.*, 64 Ohio St.3d 470, 472 (1992). Here, we have reviewed the juvenile court's records and determined that the court stayed the April 5, 2021, order and 30-day jail sentence pending resolution of this appeal. Therefore, this appeal is not moot.

**A. Standard of Review**

{¶35} Disobedience to court orders may be punished by contempt. R.C. 2705.02(A). The standard of review of a trial court's decision on a contempt motion is abuse of discretion. *Unger v. Unger*, 12th Dist. Brown No. CA2003-10-013, 2004-Ohio-7136, ¶ 26. To find an abuse of discretion, we must determine that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**B. Analysis**

{¶36} Mother argues that the juvenile court erred when it found that Mother "stated under oath that she had not said anything to the minor child about the trip to Florida." Mother is correct: the court's statement did not accurately describe Mother's testimony. In fact, Mother admitted discussing the trip to Florida with C.W.

{¶37} However, based on a review of the decision and record, we conclude that the juvenile court's basis for finding Mother in contempt was *not* that Mother lied during her testimony by stating that she did not tell C.W. about the Florida trip. Instead, citing *Ware v. Ware*, 12th Dist. Warren No. CA2001-10-089, 2002 WL 336957 (Mar. 4, 2002), the juvenile court found that Mother was in contempt because she failed to do more than merely encourage C.W. to go with Father at the exchange in the Meijer parking lot.

{¶38} In *Ware*, we held that when a court establishes a visitation schedule concerning the parties' minor children, in the absence of proof showing that visitation with the non-custodial parent would cause physical or mental harm to the children, or a showing of some justification for preventing visitation, the custodial parent must do more than merely encourage the minor children to visit the non-custodial parent. *Id*. at *2.

{¶39} There, the mother claimed that she had done everything she could possibly do to encourage the thirteen-year-old daughter's visitation with her father. *Id.* But the court

noted that in one instance, after the minor daughter had refused to go with her father because she wanted to go skating instead, the mother had permitted the child to go skating. *Id.* at *1. The mother also admitted that her method of lecturing the daughter after she refused to go with her father had little disciplinary effect and that she had not attempted other disciplinary actions. *Id.* at *2. Finally, the mother simply refused to compel the daughter to go on the visitation. *Id.* Under these circumstances, we found that the trial court did not abuse its discretion in finding the mother in contempt. *Id.*

{¶40} Here, there is even less evidence of efforts by Mother to encourage C.W.'s parenting time with Father. The extent of Mother's effort was apparently informing an eight-year-old child that "the Judge" said she had to go with Father and asking the child if she wanted to ride in a rental car. Mother did nothing else. Mother told Father that she would not physically remove C.W. from the vehicle. And Mother admitted that she took no disciplinary action either before or after C.W.'s refusal to go with Father. She added that she would not take such action, suggesting that she was not "bound" by the court's order to discipline C.W. for refusing to go with Father.

{¶41} Moreover, the evidence indicated that Mother did not simply passively interfere with Father's parenting time. Mother physically stood between Father and C.W. at the time of the required transfer, at first refusing to allow Father to speak with C.W. privately. A police officer had to raise his voice to get Mother to move away from the vehicle and even then, Mother shouted her concerns that Father would "waltz" away with C.W., when Father in fact had a court order allowing him to leave with his daughter. Mother also provided no evidence that she took any steps to facilitate Father's parenting time by encouraging C.W. to spend time with Father or disciplining C.W.—an eight-year-old child—after the failed

exchange at Meijer.[2]  Given Mother's admissions of telling the child that "we weren't going to cancel things" if she was with her Father and that "we don't just stay home and watch TV when she's not with us," it appears obvious that Mother was actively attempting to influence the child's behavior to thwart the court's order and take the child with her on the Florida vacation.  Mother's behavior fell far short of what we held was required in a situation like the *Ware* case.  Ware, 2002 WL 336957 at *2.

{¶42}  Not only did Mother not attempt to discipline C.W. for not going with Father, instead, she effectively rewarded C.W. for her refusal with a private plane ride and a vacation in Florida.  And even though the flight to Florida was two days after the failed transfer, Mother failed to notify Father of her intention to take C.W. to Florida until one hour before the family left Ohio on its private plane.  In fact, Mother failed to request Father's permission for C.W. to go to Florida even though Mother knew the juvenile court had granted Father's motion for parenting time and ordered that C.W. would spend spring break with Father.

{¶43}  The juvenile court acted well within its discretion in finding Mother in contempt of court.  We overrule Mother's first assignment of error.

{¶44}  Assignment of Error No. 2:

{¶45}  THE PURGE CONDITION TO FOLLOW THE SHARED PARENTING PLAN BETWEEN THE DATE OF THE DECISION AND THE SENTENCING DATE IS CONTRARY TO LAW.

{¶46}  Mother contends that the second purge condition—that she comply with the terms and conditions of the parties' parenting time schedule set forth in the shared parenting plan from the date of the court's order until the date of the review hearing—was a violation

2. Even if C.W.'s desires—rather than the trial court's order—controlled here, an eight-year-old child's preferences are certainly not set in stone.

- 11 -

of her due process rights. She argues that a purge condition requiring her to comply with the shared parenting plan in the future violates her due process rights because it does not give her an opportunity for a hearing to defend herself from future contempt allegations and because it simply amounts to a reaffirmation of the parties' shared parenting plan. She argues that any future allegation of contempt requires notice, a hearing, and a determination of contempt.

{¶47} Mother provides the following description of how she believes her due process concerns could play out:

> In this case, the purge condition included that Mother comply with the existing parenting orders in the future. If that purge condition is allowed to stand, Mother could show-up [sic] at a purge hearing and hear for the first time Father's allegation that she had violated the parenting order since the last evidentiary hearing. Mother would have no opportunity to prepare a defense to accusations that she had not been given proper notice of. For instance, CLW may have missed scheduled parenting time with Father due to an email agreement reached between Mother and Father, due to a severe illness, due to an unavoidable accident, due to a snow emergency, due to Father's failure to arrive at the pick-up spot on time or for multiple other legitimate reasons. The time alleged may not even be Father's time at all. Without proper notice of any new allegations, Mother does not have the ability to prepare a defense and her due process rights will be violated.

## A. Standard of Review

{¶48} Whether the court has complied with due process is a matter of law that we review de novo. *Wintrow v. Baxter-Wintrow*, 9th Dist. Summit No. 26439, 2013-Ohio-919, ¶ 9-11; *see Krusling v. Ohio Bd. of Pharmacy*, 12th Dist. Clermont No. CA2012-03-023, 2012-Ohio-5356, ¶ 9.

## B. Analysis

{¶49} To comply with due process, at a minimum, notice and an opportunity for a hearing are necessary. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652 (1950). "'An elementary and fundamental requirement of due process in any

proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Gross v. State Med. Bd. of Ohio*, 10th Dist. Franklin No. 08AP-437, 2008-Ohio-6826, ¶ 21, quoting *Mullane* at 314. Additionally, due process "embodies the concept of fundamental fairness." *Sohi v. Ohio State Dental Bd.*, 130 Ohio App.3d 414, 422 (1st Dist.1998). The concept is "flexible" and "calls for such procedural safeguards as the particular situation demands." *LTV Steel Co. v. Indus. Comm.*, 140 Ohio App.3d 680, 688-689 (10th Dist.2000); *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593 (1972). As relevant here, R.C. 2705.05 provides procedures with which a court must comply with respect to contempt proceedings, including conducting a hearing at which the court investigates the charge of contempt and hears testimony.

{¶50} Mother's due process argument is based on a series of cases analyzing purge conditions imposed after a contempt finding. In the oldest of those cases, *Tucker v. Tucker*, 10 Ohio App.3d 251 (10th Dist.1983), a father was held in contempt because of his failure to make child support payments pursuant to a divorce decree. *Id.* at 251. The court sentenced the father to ten days in jail, but the sentence was stayed "upon the condition that [the father] keeps future child support payments current and on time." *Id.* at 251. The father was also ordered to pay a $420 child support arrearage. *Id.* He timely paid the arrearage. *Id.* at 252. The father appealed, arguing that the court abused its discretion by imposing the purge condition requiring future compliance with the child support order. *Id.* at 251-52.

{¶51} In analyzing the challenged purge condition, the Tenth District Court of Appeals distinguished between criminal contempt and civil contempt:

> Offenses against the dignity or process of the court, where the
> primary purpose of the punishment imposed is to vindicate the
> authority of the court by punishing the contemnor for his

[disobedience], are criminal contempts. Violations which are primarily offenses against the party for whose benefit the order was made, and where the primary purpose of the punishment is remedial or coercive and for the benefit of the complainant, are civil contempt * * *.

*Id.* at 252. The appeals court explained that with civil contempt, "the sanction must afford the contemnor the opportunity to purge himself of his contempt." *Id.*, citing *Brown v. Executive 200, Inc.*, 64 Ohio St.2d 250 (1980); *State v. Kilbane*, 61 Ohio St.2d 201 (1980).

{¶52} Because a civil contempt finding was at issue in *Tucker*, the appeals court said that it must determine "whether the portion of the judgment entry suspending [the father's] punishment on condition that he comply with the support order in the future properly allowed for purging." *Id.* at 252. The appeals court answered this question in the negative. *Id.* It stated that, "Had the order provided for suspending the jail sentence on condition that plaintiff purge himself of his violation of the support order by paying the arrearage, it would have provided a true opportunity for purging." *Id.* "However," the court held, "insofar as it purports to regulate future conduct, it simply amounts to the court's reaffirmation of its previous support order and can have no effect since any effort to punish a future violation of the support order would require new notice, hearing, and determination." *Id.* The appeals court therefore held that "the portion of the judgment entry purporting to regulate [the father's] future conduct within the context of the contempt proceeding * * * is void." *Id.*

{¶53} We have applied similar reasoning in multiple cases. For example, in *Marden v. Marden*, 108 Ohio App.3d 568 (12th Dist.1996), a wife moved for contempt after her ex-husband failed to make spousal support payments required by the parties' separation agreement. *Id.* at 569-570. The husband was sentenced to three days in jail, stayed on the condition that he make "some payment on the current support each and every month." *Id.* at 570. We determined that because the case involved a finding of civil contempt, the sanction must provide the contemnor with the opportunity to purge his contempt. *Id.* at 571.

Quoting *Tucker*, we stated that

> a contempt order which regulates future conduct "simply amounts to the court's reaffirmation of its previous support order and can have no effect since any effort to punish a future violation of the support order would require new notice, hearing and determination."

*Id.* We held that because the portion of the contempt order conditioning suspension of the jail sentence on future payments sought to regulate future conduct, "this portion of the trial court's order does not allow [husband] the opportunity to purge himself of his contempt and is void." *Id.* at 571. However, we affirmed the trial court's order requiring the father to pay $33,646.14 in back support. *Id.* at 571.

{¶54} We applied the same analysis in *Lindholm v. Lindholm*, 12th Dist. Warren No. CA2016-08-073, 2017-Ohio-2807. There, the father kept the children from the mother during the mother's parenting time in violation of a shared parenting plan. *Id.* at ¶ 3-4. The court found the father in contempt, ordered he serve three days in jail, but suspended the jail sentence on condition that the father "comply with future orders regarding parenting time." *Id.* at ¶ 4. We held that the lower court's purge condition did not provide Father with the opportunity to purge his contempt and therefore subjected him to his three-day jail term until his youngest child was emancipated. *Id.* at ¶ 12. We found Father's assignment of error had merit, reversed, and remanded for "inclusion of an appropriate purge condition." *Id.*

{¶55} However, we affirmed a purge condition that regulated future conduct in at least one case, *In re A.A.J.*, 12th Dist. Warren No. CA2014-10-130, 2015-Ohio-2222. There, the father was found in contempt for refusing to allow the child to participate in softball during his parenting time as required by the parties' shared parenting plan. *Id.* at ¶ 5-6. The trial court sentenced the father to three days in jail but suspended the sentence on the condition that he not prohibit the child's participation in future extracurricular

activities. *Id.* at ¶ 6. We affirmed the purge order even though it regulated future conduct, explaining that "we can think of no other way to permit Father to purge when his contempt is directly based upon his refusal to allow the child to participate in games and practices that have already occurred." *Id.* at ¶ 47.

**{¶56}** In *A.A.J.*, there was no way to permit the father to purge other than requiring him to allow the child to participate in future games and practices. *Id.* at ¶ 47. But the case before us is different. Here, the juvenile court found a way for Mother to purge: it ordered her to provide Father with 14 days of uninterrupted parenting time on dates of his choosing. Therefore, unlike *A.A.J.*, there was no unavoidable need also to regulate Mother's future conduct with the second, challenged purge condition.

**{¶57}** This case is more like *Tucker* and *Marden*. In those cases, there was no need to regulate future conduct because the trial court was able to find ways for the contemnor to purge: by paying the overdue child support arrearage in *Tucker*, and by paying overdue spousal support in *Marden*. *Tucker*, 10 Ohio App.3d at 252; *Marden* 108 Ohio App.3d at 571. Likewise, in this case the juvenile court imposed an initial purge condition: the requirement that Mother provide Father with 14 days of uninterrupted parenting time on dates of his choosing. Mother does not challenge this purge condition. For these reasons, we hold that the juvenile court's purge condition requiring Mother to comply with the terms and conditions of the parenting time schedule in the shared parenting plan was void. *Tucker* at 252. The challenged purge condition could have no effect because "any effort to punish a future violation [of the shared parenting plan] would require new notice, hearing, and determination." *Id. Accord Marden* at 571.

**{¶58}** Before closing, we pause to address a conceptual issue. Mother argues that the purge condition requiring her to comply with the shared parenting plan *violated* her due process rights. We have determined that the purge condition was void, but saying that it

*violated* Mother's due process rights is not quite accurate. Notably, while *Tucker*, *Marden*, and other cases found that purge conditions that required compliance with a previous order were void, those cases either do not mention "due process" specifically or mention due process concepts (such as the requirement of conducting a hearing) but do not specifically state that the purge condition violated due process. *See Tucker* at 252; *Marden* at 571; *Lindholm*, 2017-Ohio-2807 at ¶ 7; *A.A.J.*, 2015-Ohio-2222 at ¶ 43. Some other cases do refer to such a purge condition as a constitutional violation. See *Ohler v. Ohler*, 6th Dist. Fulton No. 93FU000014, 1994 WL 506158, *6 (Sept. 16, 1994); *Miller v. Miller*, 6th Dist. Wood No. 93WD061, 1994 WL 159537, *4 (Apr. 29, 1994). Rather than characterize purge conditions requiring compliance with previous orders (thereby regulating future conduct) as violating due process, it is more appropriate to say that those purge conditions are void. Such purge conditions are void because they "can have no effect since any effort to punish a future violation of the * * * order would require new notice, hearing and a determination" because of the requirements of due process. *Tucker* at 252. This cannot be permitted because in cases involving civil contempt "the sanction must afford the contemnor the opportunity to purge himself of his contempt." *Id.* In other words, those purge conditions are void because they may require a new hearing separate from the purge hearing, and so they do not really allow a contemnor the opportunity to purge.

{¶59} Of course, our holding does not mean that Mother was not required to comply with the terms and conditions of the parties' parenting time schedule set forth in the shared parenting plan from the date of the court's order until the date of the review hearing. The shared parenting plan remained in place, and Mother has not challenged the terms of the shared parenting plan. For the foregoing reasons, we sustain Mother's second assignment of error.

**Conclusion**

{¶60}  The juvenile court did not abuse its discretion when it found Mother to be in contempt.  However, the purge condition requiring Mother to comply with the shared parenting plan was void.

{¶61}  Accordingly, we modify the trial court's contempt decision to reflect that the purge condition requiring compliance with the terms and conditions of the parenting time provisions of the shared parenting plan is vacated as void.  We affirm all other aspects of the April 5, 2021, order.

{¶62}  Judgment affirmed in part and reversed in part

S. POWELL, P.J., and HENDRICKSON, J., concur.