[Cite as *In re C.L.W.*, 2024-Ohio-1519.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY


IN RE: : 

    C.L.W. :     CASE NO. CA2023-07-048

:     O P I N I O N
    4/22/2024

: 

: 

: 


APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 2020 JG 25788


Stagnaro Hannigan Koop, Co., LPA, and Michaela M. Stagnaro, for appellant.

Taft, Stettinius & Hollister LLP, and Aimee L. Keller, for appellee.


**M. POWELL, J.**

{¶ 1} Appellant ("Father") appeals a decision of the Clermont County Court of Common Pleas, Juvenile Division, continuing the shared parenting plan he entered into with appellee ("Mother") regarding their daughter.

{¶ 2} The parties are the biological parents of C.L.W. ("Chloe") who was born in

September 2012.[1]  Mother and Father were never married to each other.  Parental rights and responsibilities for Chloe were allocated between the parties pursuant to a shared parenting plan ("SPP") filed in the Fairfield County Domestic Relations Court on November 5, 2014.  At the time the SPP was originally filed, Mother was a Fairfield County resident and Father was a Ross County resident.  Under the plan, Father had parenting time with Chloe on Wednesdays after school until 8:00 p.m., alternating weekends from Friday to Sunday, spring break on even-number years, and five weeks of extended summer parenting time.  The plan provided that the parties jointly make decisions in Chloe's best interest and in the event of an impasse, Father was granted authority to make non-mental health medical decisions and Mother was granted authority to make school-related, extracurricular, and mental health decisions.  By agreement of the parties, the case was transferred to the Clermont County Court of Common Pleas, Juvenile Division, on May 19, 2020, after Father moved to Clermont County.

{¶ 3}   Mother married her husband ("Stepfather") in November 2015, and they had a son together in 2017.  Chloe enjoys a close and bonded relationship with Stepfather and her half-brother.  Mother and her family moved to Indian Hill in August 2021.  Chloe has attended Cincinnati Country Day School since kindergarten.

{¶ 4}   Father married his wife ("Stepmother") in November 2020.  Stepmother was a widow with three children.  In the spring of 2020, Father, Stepmother, and her children moved to Clermont County, Ohio so that Father could be closer to Chloe.  The parties now live within 15 minutes of each other.  Chloe enjoys a close and bonded relationship with Stepmother and a good relationship with her step-siblings.  The step-siblings also attend Cincinnati Country Day School.

---

1. Chloe is a fictitious name for C.L.W. which we will use throughout the opinion for readability purposes.

{¶ 5} Visitation problems arose in the spring of 2020 around the time Father moved to Clermont County. Consequently, the parties filed a flurry of motions. The motions pertinent to this appeal are the following: Father's August 10, 2020 motion to modify parenting time, or in the alternative, to terminate the SPP; Father's March 22, 2021 motions for contempt and emergency custody; Father's November 16, 2021 motion for attorney fees; and Father's July 19, 2022 contempt motion. The motions were heard by the juvenile court over five days, beginning on October 18, 2021, and concluding on April 6, 2023.[2] The evidence at the hearing revealed the following.

{¶ 6} In 2018, when Chloe was five years old, Mother enrolled her in counselling with Jennifer Thornton in part due to relationship problems between Chloe and Father. This counselling continued for about two years until Thornton retired from practice in May 2020. In March 2020, after Thornton advised Mother that the relationship problems between Chloe and Father were more than could be addressed in counselling, Mother moved for the appointment of a guardian ad litem ("GAL") for Chloe and for suspension of Father's parenting time.[3] Mother then denied Father parenting time, including telephone contact, from March 2020 until August 2020. Mother cited Chloe's behavior after visits with Father as the reason she denied Father parenting time for five months. For instance, there was an incident in 2019 when Chloe returned from a visit with Father,

---

2. As noted in the juvenile court's June 30, 2023 order, the motions were heard on October 18, 2021, and continued in progress to October 20, 2021, December 6, 2022, December 7, 2022, and April 26, 2023. Notwithstanding a January 2023 entry by the juvenile court authorizing preparation of the transcripts for the hearings held on December 6-7, 2022, and an April 2023 notice of filing of transcript by Mother's counsel, there is no indication that the transcripts of the December 6-7, 2022 hearings were filed. Therefore, we will presume regularity of the proceedings and determine that the juvenile court properly weighed all available evidence submitted during the two December 2022 hearings before it issued its June 30, 2023 order ruling on Father's motions. *In re J.M.*, 12th Dist. Warren No. CA2008-01-004, 2008-Ohio-6763, ¶ 36.

3. These motions were filed in the Fairfield County Domestic Relations Court where this case originated. Due to the COVID-19 shutdown, the Fairfield County Domestic Relations Court never considered these motions before the case was transferred to Clermont County. Following the transfer of the case, the Clermont County Juvenile Court appointed a GAL for Chloe on July 15, 2020. Mother's March 2020 motion to suspend Father's parenting time was never ruled upon.

retreated to her bedroom, and repeatedly screamed, "Kill me." Mother also reported that Chloe was having emotional meltdown episodes about visitation with Father, especially when the visits were to be for an extended time, such as the 2020 spring break and the five-week extended summer visitation.

{¶ 7} Having been denied his 2020 spring break parenting time, on March 1, 2021, Father moved to exercise parenting time with Chloe during her 2021 spring break. Following a hearing and an in-camera interview with Chloe, the juvenile court granted Father's motion by order of March 9, 2021. Pursuant to the juvenile court's order, Father went to pick up Chloe at the exchange location. The attempt to transfer Chloe from Mother to Father failed as Chloe refused to get out of Mother's vehicle and go with Father while repeatedly stating, "I don't want to go" or "I'm not going." Father ultimately left without Chloe. Mother and Stepfather had planned to go to Florida to visit Stepfather's relatives while Chloe spent spring break with Father. After Chloe refused to go with Father for spring break visitation, Chloe accompanied Mother to Florida. Mother neither obtained Father's consent for this trip nor notified him of it. However, upon Mother's return from Florida, she arranged for Chloe to visit with Father for five days of the remaining spring break.

{¶ 8} On March 22, 2021, Father filed a contempt motion against Mother for violation of the juvenile court's March 9, 2021 order granting his motion for spring break parenting time. On April 5, 2021, the juvenile court found Mother in contempt for denying Father his 2021 spring break parenting time. The juvenile court sentenced Mother to 30 days in jail and provided that she could purge the contempt finding and jail by providing Father with 14 days of uninterrupted parenting time on dates of his choosing. Mother obtained a stay of the order and appealed. We upheld the juvenile court's contempt finding. *In re C.L.W.,* 12th Dist. Clermont No. CA2021-05-013, 2022-Ohio-1273.

- 4 -

Following our opinion, Father contacted Mother three times to schedule his make-up parenting time. Mother did not respond to Father's first two attempts and ultimately rejected his request for make-up parenting time. Pursuant to this finding of contempt, Father filed a motion for attorney fees on November 16, 2021. Mother has yet to purge herself of this contempt.

{¶ 9} As mentioned above, Chloe engaged in counselling with Thornton from the spring of 2018 until May 2020. Thornton believed Chloe was "torn" between her parents' homes. Chloe expressed to Thornton that she did not want to spend as much time at Father's home as Father preferred. Chloe told Thornton that whenever she told Father anything positive about Mother or Stepfather, Father would get upset or sad, would tell Chloe that she did not love him, and that Mother was trying to take her away. Thornton reported that Chloe felt guilt and responsibility for Father's emotions. On one occasion, Thornton shared with Father that Chloe would like telephone contact with Mother during her visitations with Father. During Thornton's next counselling session, Chloe was angry with her because Father had told her that Thornton shared with him everything she and Thornton talked about during counselling. Thornton also reported that Chloe was resentful of Mother's efforts to facilitate visitation and communication between Chloe and Father. According to Thornton, Chloe told her, "mommy makes me go to the visits. Mommy makes me get on the phone." Chloe also told Thornton that Father had talked to her about the pending custody/parenting time proceedings.

{¶ 10} In July 2020, when Chloe was seven years old, she began counselling with Erin Prindiville. Mother listed Chloe's surname on the intake forms as including Stepfather's name. The record also indicates that Mother originally enrolled Chloe in kindergarten under Stepfather's surname; however, Chloe's surname was changed to her legal name after an internal audit conducted at the school. Prindiville testified that Chloe

enjoys her time with both parents; is protective of both parents and does not want to hurt their feelings; is satisfied with the current parenting time arrangement; would like the option of staying overnight at Father's home on Wednesday evening visitations; and would like to spend half of her two-week spring break with each parent. Despite Mother having expressed she had denied Father's parenting time because of concerns with Chloe's behaviors after visiting Father, Prindiville had no concerns about Chloe's interaction with Father and observed no anxiety in Chloe.

{¶ 11} In response to Mother's November 2020 motion for a custody evaluation, the juvenile court appointed Dr. Edward Connor to conduct the evaluation. Dr. Connor filed a lengthy report in April 2021 and testified in October 2021. Dr. Connor testified that Chloe was a bright child, that she does not want to hurt either parent, and that she "has a sense" that Mother does not want her to have a close bond with Father. Dr. Connor expressed concern that Mother was giving Chloe authority to make parenting time decisions, stating that giving a young child that kind of power is "unhealthy" and overwhelming and can lead to Chloe feeling more pressure and anxiety. Dr. Connor also expressed concern that Mother gave Chloe a safe word when she was at Father's house as that implied that Father was dangerous and a threat to Chloe. Dr. Connor noted Mother's repeated attempts to discredit Father in Chloe's view and expressed concern that Mother's refusal to permit Father to exercise parenting time with Chloe for five months in 2020 coincided with Father's move to Clermont County to live closer to Chloe. Dr. Connor believed Father to be the parent likely to be cooperative on parenting issues. Dr. Connor recommended that Father be awarded legal custody of Chloe with each parent having equal parenting time, and that Mother's parenting time be reduced to supervised parenting time if she continued to disparage Father. Dr. Connor strongly recommended that Mother engage in individual therapy, with the therapist having access to his report.

Mother accepted Dr. Connor's recommendation and began counselling with Angela Barber-Joyner in October 2021.

{¶ 12} Mother acknowledged she failed to advise Father of all of Chloe's medical appointments, claiming that she forgets to do so at times. The record also indicates that Mother failed to advise Father of all of Chloe's school and summer activities. Mother gave Chloe a cellphone in 2019 but did not believe that Father should be given the password or permitted to call Chloe on the phone as Mother and Stepfather had purchased the phone and paid for the service. Mother recorded Father's telephone calls with Chloe from February 2018 to June 2021. Mother claimed she did so because Chloe would be upset after the conversations. Chloe was unaware Mother was recording her telephone conversations with Father. Mother ceased recording the phone calls after Father learned of the practice and the GAL objected to it.

{¶ 13} In October 2021, the parties enrolled in Our Family Wizard ("OFW"). Thereafter, Mother posted all of Chloe's medical appointments, school events, activities, and travel plans on OFW. School events are also available on Chloe's school's website. During Chloe's 2022 spring break, Mother stayed home so that Chloe would not have an excuse to refuse parenting time with Father.

{¶ 14} On Wednesday, July 6, 2022, when Father arrived at Mother's home to exercise his scheduled parenting time, Mother refused to answer the door. Mother claimed that she refused Father's parenting time because it was her week of "uninterrupted time." However, she had failed to provide 28 days' notice of her intent to exercise "uninterrupted time" as required under the SPP.

{¶ 15} Father was again denied parenting time on July 17, 2022, when Mother failed to appear with Chloe at the exchange location and then failed to respond to Father's OFW messages and telephone calls. Father was finally able to retrieve Chloe on July 18,

2022. Mother's July 2022 withholdings of Father's parenting time resulted in Father filing a second contempt motion against Mother on July 19, 2022.

{¶ 16} Another incident occurred over Labor Day weekend 2022, a weekend that was designated as Father's parenting time. Stepfather's cousin was getting married that weekend and Chloe, who was close with the cousin, wanted to attend the wedding. Mother emailed Father on August 1, 2022, and requested that he trade a weekend with her so that Chloe could attend the wedding; Mother advised Father that the RSVP deadline was August 9, 2022. In his reply, Father advised Mother, "You are going to have to be willing to sacrifice if you expect us to." Although Father was willing to forego his parenting time to permit Chloe to attend the wedding, he would do so only if the make-up parenting time was agreed upon at the outset. The parties could not agree on make-up parenting time before the wedding RSVP date passed, and Chloe did not attend the wedding.

{¶ 17} In the fall of 2022, Mother arranged for the parties to have lunch together after Chloe's orthodontist appointment. Around the same time, Chloe was given four tickets to a performance at the Children's Theater. Although Mother planned to take Chloe and two of her friends to the performance, she gave the tickets to Father upon realizing the performance fell during Father's weekend parenting time. Father, Stepmother, Chloe, and one of Chloe's friends went to the performance. Mother also invited Father to coach Chloe's flag football team with her.

{¶ 18} The GAL's testimony indicates that as of April 26, 2023, Mother was no longer withholding or interfering with Father's parenting time under the SPP; Chloe had modified her wishes, and wanted to spend more time with Mother than with Father because Father "hurts her emotionally"; and Mother continues to engage in counselling but Father did not because it was cost prohibitive. However, the GAL also expressed

serious concerns about the impact of Mother's conduct on Chloe. The GAL recommended that Father be designated residential parent and that Mother's parenting time be supervised if Mother did not modify her behavior.

{¶ 19} On June 30, 2023, the juvenile court ruled upon the various pending motions. Regarding the SPP, the juvenile court found that there had been a substantial change in the circumstances of Mother and proceeded to consider and discuss the R.C. 3109.04(F) best interest factors.[4] The juvenile court observed that "Mother and Father each possess the emotional, intellectual, and financial resources to provide [Chloe] a childhood replete with stability, security, and happiness. Both parents have spouses that add to this positive environment in their homes." The juvenile court also observed that Mother had made positive strides during the extended duration of the case, noting that Mother had "heeded" Dr. Connor's testimony and had been actively engaged in therapy since October 2021. The juvenile court was also impressed by Mother's invitation to Father to coach Chloe's flag football team with her.

{¶ 20} Upon considering the applicable R.C. 3109.04(F) factors, the juvenile court found it was in Chloe's best interest to maintain the SPP. The juvenile court granted Father's motion to modify his parenting time and the SPP. However, the modifications were not substantial. The SPP was maintained but was modified to provide the parties with parenting time with Chloe on alternating weeks during the summer; further, the parent who does not have parenting time with Chloe during a week has parenting time on Wednesday evening from 4:00 p.m. to 7:00 p.m. The juvenile court's order that the parties exercise summer parenting time on an alternating week-to-week basis resulted in a reduction of the five weeks of extended summer parenting time to which Father was

4. As we note below, a change of circumstances is not a predicate finding for the modification/termination of the SPP in this case.

- 9 -

entitled under the original SPP.

{¶ 21} Regarding its April 5, 2021 order finding Mother in contempt for denying Father parenting time during the 2021 spring break, the juvenile court noted the "unrefuted evidence that Father has yet to be provided with make-up parenting time pursuant to the purge language in the Order." Nonetheless, the juvenile court declined to impose a sentence, holding there would be "no productive purpose in imposing a sentence" because "[t]he 'power plays' and obstructionist conduct have been replaced with cooperation and flexibility." However, the juvenile court noted that this contempt finding, "as a first offense, was not purged; as such, any subsequent contempt actions could subject [Mother] to enhanced penalties as a second offender."

{¶ 22} The juvenile court denied Father's November 16, 2021 motion for attorney fees, finding there was no evidence produced during the hearing as to the reasonableness of the fees.

{¶ 23} The juvenile court granted Father's July 19, 2022 contempt motion, finding Mother in contempt for denying Father parenting time on July 6, 2022. The juvenile court found that Mother "demonstrated a full understanding of the terms of the [SPP]" throughout the proceedings and "willfully, and without just cause, disregarded the Plan." The juvenile court provided that Mother may purge this contempt by providing Father with an additional seven days of uninterrupted parenting time during Chloe's summer break. However, the juvenile court did not impose a sentence, noting "the tremendous strides that the parties have made over the course of the past year, resulting in a spirit of communication and cooperation for the best interest of the minor child." Nonetheless, the juvenile court noted that "this determination does result in the Mother being found in contempt as a second offender. As such, in the event of a subsequent contempt finding being made against her, she will be eligible for the more severe sanctions associated with

a third offense contempt."

{¶ 24} Father now appeals, raising four assignments of error.

{¶ 25} Assignment of Error No. 1:

{¶ 26} THE TRIAL COURT ABUSED ITS DISCRETION BY NOT FINDING THAT IT WAS IN THE CHILD'S BEST INTERESTS TO TERMINATE THE PARTIES' SHARED PARENTING PLAN AND DESIGNATE APPELLANT THE SOLE RESIDENTIAL AND LEGAL CUSTODIAN OF THE CHILD.

{¶ 27} Father argues the juvenile court abused its discretion by failing to terminate the SPP and designate him as the residential parent based upon the following evidence: Mother denied Father parenting time for five months in 2020, based upon Mother's claim that this is "what [Chloe] wants" despite evidence from Dr. Connor, the GAL, Father, Stepmother, and Chloe's therapists to the contrary; Mother's repeated denials of Father's parenting time despite Father's attempts to communicate with Mother concerning the issue and resulting in Mother being found in contempt twice; Mother's efforts to alienate Chloe from Father by recording Father's phone calls with Chloe, "reminding" Chloe on occasions that "Daddy made her sad," and disparaging Father as a sperm donor or as less than Stepfather; and scheduling medical and school appointments for and enrolling Chloe in extracurriculars activities without notifying Father.

{¶ 28} A juvenile court has broad discretion to modify a shared parenting agreement or terminate it altogether. *In re A.C.F.*, 12th Dist. Warren No. CA2023-03-022, 2023-Ohio-3296, ¶ 12. A juvenile court's determination that shared parenting continues to be or is no longer in the best interest of the parties' child will not be reversed absent an abuse of discretion. *Id.*

{¶ 29} Because Father moved to terminate the SPP, his motion was governed by R.C. 3109.04(E)(2)(c), and a change-in-circumstances finding was not required. *Bruns*

*v. Green*, 163 Ohio St.3d 43, 2020-Ohio-4787, ¶ 20; *In re D.M.*, 196 Ohio App.3d 50, 2011-Ohio-3918, ¶ 26 (12th Dist.). Under R.C. 3109.04(E)(2)(c), a juvenile court may terminate a shared parenting plan if it determines that shared parenting is not in the best interest of the child. The juvenile court makes this determination by considering the factors set forth in R.C. 3109.04(F)(1) and (F)(2). *In re A.C.F.* at ¶ 14. As relevant here, these factors include the wishes of the child's parents regarding the child's care; the child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; the child's adjustment to the child's home, school, and community; the parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights; and whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court. R.C. 3109.04(F)(1)(a),(c), (d), (f), and (i). These factors also include the ability of the parents to cooperate and make decisions jointly, with respect to the child; the ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent; and the recommendation of the child's guardian ad litem. R.C. 3109.04(F)(2)(a), (b), and (e).

{¶ 30} Upon a thorough review of the record, we find no abuse of discretion in the juvenile court's decision to continue the parties' SPP. In so holding, we stress that decisions concerning allocation of parental rights and responsibilities are guided by a child's best interest and should not be used as a cudgel to punish a misbehaving parent. The evidence supports the juvenile court's decision that it is in Chloe's best interest to maintain shared parenting.

{¶ 31} In addressing the best interest factors under R.C. 3109.04(F), the juvenile court found that Chloe (1) has a close, secure, and bonded relationship with both Father

- 12 -

and Mother, (2) enjoys a positive and healthy relationship with both Stepmother and Stepfather, (3) enjoys a normal sibling-like relationship with her step-siblings and a positive bond with her half-brother, (4) is fully integrated in both parents' homes, has been attending Cincinnati Day Country Day since kindergarten, a school attended by her step-siblings, and is engaged in several extracurricular activities. The record supports the juvenile court's findings.

{¶ 32} The juvenile court also noted Mother's disregard for the parenting time schedule set forth in the SPP, Mother's decision to register Chloe in kindergarten under Stepfather's surname, and the serious misgivings expressed by Dr. Connor and the GAL about the impact of Mother's conduct on Chloe, prompting both Dr. Connor and the GAL to recommend supervised parenting time for Mother, with Father as the residential parent, if Mother did not modify her behavior.

{¶ 33} In addressing Mother's conduct, the juvenile court placed great weight on Mother's efforts to do better. The court noted that Mother's motivation in enrolling Chloe under Stepfather's surname was because there were no other children in her class whose parents were divorced, and thus, Chloe felt different. The court also found that the lengthy delay of proceedings caused by the COVID-19 pandemic benefitted Mother in that she heeded Dr. Connor's observations and evaluation, actively engaged in individual therapy in October 2021, and subsequently changed her behavior and actions toward Father. The juvenile court specifically noted Mother's "compelling testimony" that she is "trying to create positivity around [Father] and his family [and] promote positive feelings about [Father] and his family," and that she shares with Chloe memories and stories of experiences Chloe and Father shared. The juvenile court also noted how, since July 2022, "Mother has evolved from placing obstacles in the way of Father's parenting time to that of cooperating and facilitating parenting time." The court cited Mother arranging

an impromptu lunch with Father and Chloe after Chloe's orthodontist appointment, Mother giving Father tickets for the Children's Theater performance, Mother inviting Father to coach Chloe's flag football team together, and Mother's decision not to travel for the 2022 spring break as examples of Mother's compelling change in behavior.

{¶ 34} The hearing on this matter and Father's various motions lasted five days between October 2021 and April 2023, with numerous witnesses, and, excluding the two December 2022 hearings for which transcripts were not filed, almost 700 pages of testimony. In particular, the juvenile court heard testimony from both Father and Mother and was consequently able to make its own credibility determinations in deciding what was in Chloe's best interest. Appellate courts are ill-suited to make decisions regarding the better overall environment for a child based on a cold record, whereas juvenile courts, where the evidence is presented and witnesses are evaluated, are more aptly suited to make them. *In re A.B.*, 12th Dist. Butler No. CA2009-10-257, 2010-Ohio-2823, ¶ 35. The juvenile court's decision to maintain shared parenting is supported by the record, and we decline to second-guess the juvenile court in this matter. Thus, the juvenile court's refusal to terminate the SPP did not constitute an abuse of discretion.

{¶ 35} Given Mother's two contempt findings and the concerns expressed by Dr. Connor, Chloe's therapists, and the GAL that Chloe feels torn between her parents' homes, it is worth stressing that "children have certain rights, including 'the right to love each parent, without feeling guilt, pressure, or rejection; the right not to choose sides; the right to have a positive and constructive on-going relationship with each parent; and most important * * * the right to not participate in the painful games parents play to hurt each other or to be put in the middle of their battles.'" *In re D.M.*, 2011-Ohio-3918 at ¶ 30, quoting *In re Custody of Harris*, 168 Ohio App.3d 1, 2006-Ohio-3649, ¶ 11. "In today's society that fully admits the need for parenting by both parents, each parent should have

full involvement in the child's life[.]" *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 1997-Ohio-260.

**{¶ 36}** Father's first assignment of error is overruled.

**{¶ 37}** Assignment of Error No. 2:

**{¶ 38}** THE TRIAL COURT ABUSED ITS DISCRETION BY NOT MODIFYING THE PARTIES' SHARED PARENTING PLAN TO AWARD FATHER MORE PARENTING TIME WITH THE CHILD IN THE CHILD'S BEST INTERESTS.

**{¶ 39}** Father argues the juvenile court abused its discretion by failing to modify the SPP to provide him with additional parenting time and greater parenting rights. Father sought to terminate the SPP and be designated as Chloe's residential parent; Mother sought to continue shared parenting and SPP, but was amenable to some modifications to the parenting time schedule such as alternating weekly rotation during Chloe's summer break. Mother further wanted all decision-making authority.

**{¶ 40}** R.C. 3109.04(E)(2)(b) allows for the modification of the terms of a shared parenting plan and authorizes the juvenile court—on its own initiative or at the request of one or both parents—to modify the terms of the shared parenting plan when modification is found to be in the best interest of the child. *Bruns*, 2020-Ohio-4787 at ¶ 11. "Modifications under this division may be made at any time. The court shall not make any modification to the plan under this division, unless the modification is in the best interest of the children." R.C. 3109.04(E)(2)(b). The juvenile court makes this determination by considering the factors set forth in R.C. 3109.04(F)(1). *In re A.C.F.*, 2023-Ohio-3296 at ¶ 19. No one factor is dispositive, and the court has discretion to weigh the factors as it sees fit. *Leach v. Leach*, 12th Dist. Butler No. CA2019-06-092, 2020-Ohio-1181, ¶ 9. An appellate court reviews a juvenile court's modification of a parties' shared parenting plan regarding parenting time for an abuse of discretion. *Mack v. Mack*, 12th Dist. Butler No.

CA2018-09-179, 2019-Ohio-2379, ¶ 39.

{¶ 41} Under the original SPP, Father had parenting time with Chloe on Wednesdays after school until 8:00 p.m., alternating weekends from Friday to Sunday, spring break on even-number years, and five weeks of extended summer parenting time. The plan provided that the parties jointly make decisions in Chloe's best interest and, in the event of an impasse, Father was granted authority to make non-mental health medical decisions and Mother was granted authority to make school-related, extracurricular, and mental health decisions. The juvenile court's June 30, 2023 order (1) modified the summer parenting time schedule to provide that the parties exercise parenting time on alternating weeks and that the parent that does not have parenting time during a week is entitled to parenting time on Wednesday from 4:00 p.m. to 7:00 p.m., (2) granted Mother every Fourth of July and Father every Labor Day, (3) modified the exchange location, and (4) added a "mediation clause" requiring the parties to attend at least two mediation sessions in the event of future conflict between the parties relating to Chloe and prior to filing any pleadings with the court. The SPP and all of its other particulars, including parenting time during the school year, remained unchanged.

{¶ 42} Upon a thorough review of the record, we find no abuse of discretion in the juvenile court's modification of the SPP. The juvenile court considered the applicable best interest factors set forth in R.C. 3109.04(F)(1), noted Chloe's close and bonded relationship with both Father and Mother and their respective families, and found that Chloe is adjusted and integrated in both homes and at school. Regarding the parent more likely to honor and facilitate court-approved parenting time rights, the juvenile court specifically noted Mother's disregard for the SPP's parenting time schedule and her prior interference with Father's parenting time but found that Mother's recent change of behavior mitigated such concern. The record shows that Chloe is satisfied with the

current parenting time arrangement and is doing well. If anything, the record indicates that Chloe would prefer to spend somewhat more time with Mother than Father. The juvenile court was in the best position to determine the credibility of the witnesses, including Mother. *Leach*, 2020-Ohio-1181 at ¶ 10. While a parent's wishes about the care of his or her child must be considered by the juvenile court, It is the child's best interest that controls, not the parents'. *Mack*, 2019-Ohio-2379 at ¶ 44, 45.

{¶ 43} We note that Mother and Father undoubtedly love Chloe and want what is best for her. Chloe also loves her parents. However, Chloe struggles with the interpersonal drama between her parents arising from their co-parenting arrangement. Unfortunately, both parents have exacerbated Chloe's struggles. Father has engaged in tactics to manipulate Chloe by guilting her about her relationship with Mother and Stepfather. Mother has engaged in conduct denigrating Father. Furthermore, rather than acting in her role as the parent in the situation, Mother has also given Chloe too much responsibility for when she will visit with Father than is appropriate for a child of Chloe's age. Mother bears more fault than Father for the resulting visitation problems as demonstrated by the two contempt findings against her. However, in crafting a parenting time arrangement, the goal is to promote Chloe's best interest, not to punish a parent for misbehavior of the sort described above. The evidence supports the juvenile court's finding that the SPP, as modified, is in Chloe's best interest.

{¶ 44} Father's second assignment of error is overruled.

{¶ 45} Assignment of Error No. 3:

{¶ 46} THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO SANCTION APPELLEE FOR HER VIOLATIONS OF THE PARTIES' SHARED PARENTING PLAN AFTER FINDING HER IN CONTEMPT OF THE PLAN.

{¶ 47} Father argues the juvenile court abused its discretion by failing to sanction

Mother upon finding her in contempt twice.

{¶ 48} On April 5, 2021, Mother was found in contempt for denying Father his 2021 spring break parenting time with Chloe in violation of the juvenile court's March 9, 2021 order. We upheld the juvenile court's contempt finding and the purge condition that Mother provide Father with 14 days of uninterrupted parenting time on dates of his choosing. *In re C.L.W.*, 2022-Ohio-1273. In its June 30, 2023 order, the juvenile court declined to impose a sentence, holding there would be "no productive purpose in imposing a sentence" because "[t]he 'power plays' and obstructionist conduct have been replaced with cooperation and flexibility." The juvenile court went on to observe that Mother's "finding of contempt, as a first offense, was not purged; as such, any subsequent contempt actions could subject her to enhanced penalties as a second offender."

{¶ 49} On June 30, 2023, Mother was found in contempt a second time for denying Father parenting time on July 6, 2022. The juvenile court provided that Mother may purge this contempt by providing Father with an additional seven days of uninterrupted parenting time during Chloe's summer break. The juvenile court did not impose a sentence, noting "the tremendous strides that the parties have made over the course of the past year, resulting in a spirit of communication and cooperation for the best interest of the minor child." However, the juvenile court noted that "this determination does result in the Mother being found in contempt as a second offender. As such, in the event of a subsequent contempt finding being made against her, she will be eligible for the more severe sanctions associated with a third offense contempt."

{¶ 50} This case concerns indirect contempt, which is defined as behavior that occurs outside the presence of the court and demonstrates a lack of respect for the court or its lawful orders. *Mackowiak v. Mackowiak*, 12th Dist. Fayette No. CA2010-04-009, 2011-Ohio-3013, ¶ 37. Although punishment is inherent in contempt, courts will

categorize the penalty as either civil or criminal based on the character and purpose of the punishment. *In re J.M.*, 12th Dist. Warren No. CA2008-01-004, 2008-Ohio-6763, ¶ 47. While criminal contempt is characterized by an unconditional prison sentence, civil contempt is marked by remedial or coercive punishment, doled out for the "benefit of the complainant." *Id.* "Another hallmark of civil contempt, incarceration as a punishment is conditional so that 'the contemnor is said to carry the keys of his prison in his own pocket.'" *Id.* Because a civil contempt sanction is coercive in nature, the contemnor must have the opportunity to purge his contempt; once compliance has been achieved, any sanctions are discontinued. *Id.*

**{¶ 51}** Once a party is found in contempt, a trial court "may impose" any of the penalties set forth in R.C. 2705.05(A)(1) thru (3), to wit:

> (1) For a first offense, a fine of not more than two hundred fifty dollars, a definite term of imprisonment of not more than thirty days in jail, or both;
>
> (2) For a second offense, a fine of not more than five hundred dollars, a definite term of imprisonment of not more than sixty days in jail, or both;
>
> (3) For a third or subsequent offense, a fine of not more than one thousand dollars, a definite term of imprisonment of not more than ninety days in jail, or both.

**{¶ 52}** An appellate court reviews a finding of contempt, including a trial court's imposition of penalties, under an abuse of discretion standard. *Mackowiak* at ¶ 45. An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore, v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). The vast majority of cases in which an abuse of discretion is asserted involve claims that the decision is unreasonable, that is, one that is not supported by a sound reasoning process. *In re A.C.F.*, 2023-Ohio-3296 at ¶ 12. Abuse of discretion is a highly deferential standard of review that rests on the premise that the trial judge is in the best position to determine

the credibility of witnesses because he or she is able to observe their demeanor, gestures, and attitude. *Mack*, 2019-Ohio-2379 at ¶ 14.

{¶ 53} Though the juvenile court found Mother in contempt twice for denying Father parenting time, the court declined to impose penalties, noting that "the lengthy delays in the proceedings have given Mother ample opportunity to modify her conduct, and she has availed herself of the opportunity," subsequently replacing her "'power plays' and obstructionist conduct" with cooperation and flexibility. The court further noted "the tremendous strides [that] the parties have made over the course of the past year, resulting in a spirit of communication and cooperation." R.C. 2705.05(A) does not require a trial court to impose a penalty upon finding a party in contempt. The juvenile court was in the best position to observe the parties' demeanor and attitude during the several hearings and weigh their credibility. In determining whether the juvenile court abused its discretion by imposing no penalties for Mother's contempt findings, it is not necessary that we agree with how the juvenile court construed and weighed the evidence. On the contrary, "if the record contains competent and credible evidence which supports the trial court's decision," then there is no abuse of discretion. *In re W.P.*, 12th Dist. Fayette No. CA2023-04-008, 2023-Ohio-4083, ¶ 15. The juvenile court referenced such evidence in its decisions not to impose contempt penalties. We decline to substitute our judgment for that of the juvenile court in this regard. And while we acknowledge our reservations with the juvenile court's decision not to sanction Mother for contempt, particularly for her denial of Father's 2021 spring break parenting time which she has yet to purge, the juvenile court was in a much better position than this court to gauge what impact a contempt sanction might have on implementing the modified SPP going forward. We decline to substitute our judgment for that of the juvenile court in this regard as well. That being said, the two contempt findings against Mother remain, subjecting her to severe sanctions

should she be found in contempt for a third or subsequent time.

{¶ 54} Father's third assignment of error is overruled.

{¶ 55} Assignment of Error No. 4:

{¶ 56} THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO AWARD APPELLANT ATTORNEY FEES AFTER FINDING APPELLEE IN CONTEMPT OF THE PARTIES' SHARED PARENTING PLAN.

{¶ 57} On November 16, 2021, Father filed a motion for attorney fees relating to Mother having been found in contempt for withholding Father's 2021 spring break parenting time. Accompanying Father's motion was an affidavit executed by Father's counsel stating the number of work hours performed and counsel's hourly rate. The affidavit further stated that the attorney "fees charged are reasonable and necessary to represent [Father] in this action," and that the attorney regularly practices before the Clermont County Juvenile and Domestic Relations Courts. The juvenile court denied the motion, finding "there was no testimony at trial in support of this Motion" and "there was not the requisite testimony by a third party attorney as to the reasonableness of the fees, based upon local market hourly rates for the type of legal services rendered." Father's July 19, 2022 contempt motion also sought an award of attorney fees. Nothing accompanied that motion relating to his request for attorney fees. The juvenile court granted Father's contempt motion but did not address his request for attorney fees, thereby implicitly denying it. *Kostelnick v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, ¶ 13 (A motion not expressly decided by a trial court when the case is concluded is ordinarily presumed to have been overruled). On appeal, Father argues the juvenile court abused its discretion by failing to award him reasonable attorney fees upon finding Mother in contempt twice. Father asserts the award of attorney fees is mandatory under R.C. 3109.051(K).

{¶ 58} R.C. 3109.051(K) governs the issuance of attorney fees when a party is found in contempt of court for failing to comply with a parenting time order. The statute provides that the trial court "shall" award "reasonable" attorney fees and court costs "arising out of the contempt proceeding against the person" found in contempt. The award of attorney fees is therefore mandatory upon a finding of contempt under R.C. 3109.051(K). *Hart v. Spenceley*, 12th Dist. Butler No. CA2011-08-165, 2013-Ohio-653, ¶ 21. The award of attorney fees must also be "reasonable." *Id.* at ¶ 22; R.C. 3109.051(K).

{¶ 59} Reasonableness for purposes of calculating attorney fees is a question of fact and the trial court must have evidence before it probative of that issue in order to make the finding. *Rapp v. Pride*, 12th Dist. Butler No. CA2009-12-311, 2010-Ohio-3138, ¶ 32. Reasonable attorney fees must be based upon actual services performed by the attorney and upon the value of those services. *Id.* "A raw calculation of hours spent multiplied by the attorney's hourly rate is not sufficient to determine the reasonableness of the fees." *M.A.B. v. B.L.R.*, 8th Dist. Cuyahoga No. 112600, 2024-Ohio-573, ¶ 36, citing *Bittner v. Tri-County Toyota, Inc.,* 58 Ohio St.3d 143 (1991). We review the juvenile court's valuation of attorney fees for an abuse of discretion. *Rapp* at ¶ 32.

{¶ 60} Loc.R. 20(A) of the Clermont County Common Pleas Court, Juvenile Division, requires motions for attorney fees to be in writing. Loc.R. 20(B) governs reasonable attorney fees and provides

> Absent formal evidence, as set forth in Section (C) herein, $500.00 shall be considered a reasonable attorney fee in contempt of court proceedings, unless otherwise determined by the Court. In determining the necessity for and the reasonableness of attorney fees, the Court may rely on its own knowledge and observations of the time and effort expended, tactics used, results obtained, discovery cooperation shown, settlement efforts made and compliance with Court orders demonstrated. The Court may also consider

- 22 -

the amount of attorney fees the opposing party has incurred in the same matter.

{¶ 61} In support of a motion/request for attorney fees, Loc.R. 20(C)(1) requires the attorney to present (a) "an itemized statement describing the services rendered, the time expended for such services, the requested hourly rate and the necessary expenses and costs for litigation," (b) testimony regarding complicating factors necessitating extra time spent on the case, (c) testimony regarding the attorney's years in practice and experience in juvenile court cases, and (d) evidence of the defending party's ability to pay and of the moving party's need for an award of attorney fees. Loc.R. 20(C)(2) provides that "[f]ailure to comply with the provisions of this rule shall result in the denial of a request for attorney fees in excess of $500.00 in contempt of court proceedings[.]"

{¶ 62} We find that the juvenile court did not err in denying Father's request for attorney fees contained within his July 19, 2022 contempt motion. "Although the language in R.C. 3109.051 is mandatory, attorney fees must also be reasonable and based on the actual services performed by the attorney and the value of those services. It is axiomatic that a trial court cannot make a finding when there is no evidence in the record." *Hart*, 2013-Ohio-653 at ¶ 25. Not only did Father fail to present documents in support of his request for attorney fees, he also did not specify the amount of attorney fees he incurred related to the contempt motion. Therefore, it was impossible for the court to determine an award of attorney fees. *Id.*

{¶ 63} We find, however, that the juvenile court erred by failing to award $500 in attorney fees regarding Father's November 16, 2021 motion for attorney fees. Loc.R. 20(B) provides that once the juvenile court finds a party in contempt, attorney fees of $500 are considered reasonable and must be awarded, "unless otherwise determined by the Court." For reasonable attorney fees above $500 to be awarded pursuant to a contempt

finding, the moving party must present independent evidence to substantiate the award as reasonable. *Vandeventer v. Vandeventer*, 132 Ohio App.3d 762, 770 (12th Dist.1999). Father's motion complied with Loc.R. 20(C)(1)(a) in that counsel's affidavit presented her hourly rate and the number of hours spent and included an itemized statement. However, the motion did not comply with Loc.R. 20(C)(1)(b)-(d) as there was no testimony or documentation presented regarding factors complicating the case, counsel's experience in juvenile court cases, Mother's ability to pay the attorney fees, and Father's need for attorney fees. The juvenile court's order denying Father's motion for attorney fees was not based upon a determination that $500 was an unreasonable attorney fee in the case but upon Father's failure to address the requirements for an award of attorney fees exceeding $500. The juvenile court, therefore, did not err in denying Father's November 16, 2021 motion for attorney fees sought in excess of $500 but erred in failing to award Father $500 in attorney fees. *Id.*; Loc.R. 20(B) and (C).

**{¶ 64}** Father's fourth assignment of error is sustained. Pursuant to App.R 12(B), we hereby enter an award of $500 in attorney fees to Father.

**{¶ 65}** Judgment affirmed as modified.

S. POWELL, P.J., and PIPER, J., concur.